555 So.2d 1355 (1990)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
v.
Roger DIETRICH, et al.
No. 89-C-1534.
Supreme Court of Louisiana.
February 5, 1990.
Rehearing Denied March 8, 1990.
*1356 Donald Kelly, Natchitoches, Jeffrey Thomas, Shreveport, Kelly & Salim, Natchitoches, for applicants.
Ronald J. Bertrand, Bertrand & Soileau, Lake Charles, for respondent.
WATSON, Justice.
A writ was granted to consider whether the Louisiana constitutional requirement[1] that a landowner be fully compensated for an expropriation requires an award to these landowners for loss of profits from their cattle production/slaughterhouse business.[2]

FACTS
On December 31, 1980, the Dietrichs[3] purchased a 365.19 acre tract of land for $304,450 and invested an additional $30,000 in clearing the land. They intended to raise cattle on the property to supply the *1357 slaughterhouse business Leonard Melvin Dietrich had purchased in 1975. The Dietrichs bought $78,000 worth of cattle, approximately 150 head, and placed them on the land. The 150 "mama cows"[4] produced about 85 heifers and 50 steers per year, which provided heifers for the slaughterhouse and steers for auction. For two years, the combined operation was very successful, giving better meat at a saving of $.15 to $.20 per pound.
According to Dietrich, he would not have needed his cattle herd if it had not been for his slaughterhouse business. The cattle operation was intended to go along with the slaughterhouse business and it helped the slaughterhouse substantially because Dietrich could raise calves cheaper than he could buy them. Clarence Homer Jordan assisted Melvin Dietrich in planning his pasture and livestock program. According to Jordan, a county agent for 33 years, Dietrich put in drainage, bermuda grass, permanent pastures and a good fertilizer program. Jordan testified that "Dietrich had the best money making deal in the livestock business I know of."[5]
In July of 1983, the Department of Transportation and Development (DOTD) expropriated 43.74 acres of the Dietrichs' tract for construction of Interstate Highway 49. Before the taking, the Dietrichs had a tract which was roughly square with unimpeded all-weather access from a paved parish road and a secondary gravel road along the east side of the property. The expropriated area cut across the property diagonally from the northwest to the southeast leaving a 140.6 acre triangular section of land to the east and a 180.85 acre triangular section to the west.
During the four-year construction of I-49, the Dietrichs were unable to reach the western section of their land. Because the eastern area could not sustain their entire herd, the Dietrichs sold 135 head of cattle for $38,300. The distress sale resulted in a $39,700 loss. After completion of I-49, the DOTD provided limited access to the western area through a paved drainage ditch which is frequently flooded and impassable approximately seven months of the year. According to E.J. Giering III, an expert in civil engineering and land surveying, the paved ditch provides the main drainage for the entire area and tends to hold water even during dry seasons. Since it is not profitable to raise cattle solely on the eastern section, the Dietrichs have been unable to maintain their cattle-raising operation.
The severance damages, which have not been paid, include monies to restore year-round access to the western parcel. Since the restored access will not permit the cattle to move freely from one side of the Dietrichs' land to the other, fewer cattle can be maintained. While 365 acres was a viable and profitable economic unit for the Dietrichs' cattle business, the smaller tracts are not. However, the Dietrichs will be able to have a 50 to 55 cow herd if facilities, including a holding pen and barn, are built on the western tract to duplicate those existing on the eastern tract.
Allen Joe Solomon, a dealer in livestock and an expert in raising cattle, testified that, in his opinion, the Dietrichs could not profitably raise a production herd on the remaining property. According to Solomon, there is an old saying that less than 100 cows is a waste of time. To run 50 head, the Dietrichs will have to double their costs and duplicate everything that is on the east side at a cost of $30,000 to $50,000. During the month of trial, July, 1987, the cattle business was in its best year in the previous six and the best year in Solomon's memory. In Natchitoches Parish, the Dietrichs were the only cattle farmers with a slaughterhouse which enabled them to make more on their calves than anyone else because they had no traveling or commission costs and a built-in market.
Solomon's testimony was corroborated by that of Adolph Sklar, Jr., an expert in the buying and selling of cattle, who testified that the Dietrichs' cattle/slaughterhouse operation was a successful, integrated business. While the Dietrichs can still produce calves, the expense of doing so on the divided tracts will be approximately doubled. After the taking, Dietrich kept his cattle as long as he could and finally sold them to Sklar when he ran out of grass and had to liquidate.
According to David A. Waskom, the Dietrichs' accountant, their present inability to raise cattle on their remaining land has resulted in economic damage to both their cattle-raising operation and their slaughterhouse. The Dietrichs had to sell out because they did not have enough usable land to support their cattle. Waskom advised them to sell. The slaughterhouse must pay $.15 to $.20 more per pound to replace the beef formerly supplied by the Dietrichs' *1358 heifers. Waskom testified that by considering the average weight of the calves sold (600 lb.) and the number of heifers sold through the slaughterhouse annually (85), he determined that the slaughterhouse suffered a loss of $7,650 per year (600 lb. X 15 cents X 85 calves). The slaughterhouse also lost $23 per calf or $1,955 yearly from the sale of by-products. The total annual loss suffered by the slaughter house was $9,605. The DOTD did not produce any evidence contrary to Waskom's testimony.
Besides damage to the slaughterhouse operation, economic loss was sustained by the Dietrichs' cattle-raising operation. Dr. Earl G. Thames, an expert economist and professor of business at Northwestern State University, testified that the cattle-raising operation suffered an $11,700 annual loss from the taking. He arrived at the annual loss amount by multiplying a 150 lb. weight gain per year for each calf by 130 calves by 60 cents per pound (150 lb. X 130 X 60 cents). Thames obtained the figures for his calculations from statistics compiled from the Dietrichs' businesses. Thames calculated the past economic loss by multiplying the $11,700.00 annual loss by the four years from the expropriation until the date of trial. Thames calculated the future loss on the rather speculative basis of the remaining 39 years of Roger Dietrich's life expectancy.
The DOTD contends that the Dietrichs could have continued their cattle-raising operation by purchasing or renting additional land. However, the DOTD has not paid the severance damages which could have paid for relocation or replacement.
The DOTD deposited $48,700 in the registry of the court as compensation for the taking. The Dietrichs withdrew the funds with full reservation of their rights to any further compensation. They then alleged that the land taken had a greater value than the amount deposited, that severance damages were warranted, that damage to their cattle operation and slaughter house were sustained as a result of the taking, and that attorney's fees were due. The jury awarded damages as follows:

Taking of property: $53,305
Severance damage to remainder
of the property: 132,569
Cost of cure: 54,954
Past economic loss from 1983 to
1987: 99,600
Future economic loss: 306,000

The court of appeal[6] affirmed the awards for the taking and the severance damages, but reversed the award for cost to cure which partially duplicated the severance award.[7] The court of appeal also reversed the past and future economic losses on the ground that they were not supported by law or fact.

LAW
In 1974, the Louisiana Constitution was re-worded to provide that an "owner shall be compensated to the full extent of his loss" when land is expropriated by the state.[8] Previously, a landowner could only receive the fair market value and any severance damages for property taken through expropriation. The change permits a landowner to remain in an equivalent financial position to that which he enjoyed before the taking. State Through Department of Highways v. Bitterwolf, 415 So.2d 196 (La.1982); State Through Department of Highways v. Constant, 369 So.2d 699 (La.1979).
Article I, Section 4, does not specify how to fully compensate a landowner whose property is taken. Delegates to the Constitutional Convention explained that full compensation should include moving costs, costs to relocate, inconvenience, and loss of profits from takings of business premises.[9] Where economic losses suffered by a business have been proven, damages for incidental and consequential loss must be awarded to fully compensate the owner. Article I, Section 4, provides that the landowner should be compensated for "his loss" not merely the loss of the land.[10]
Constant decided that full compensation under Article I, Section 4, included restoration of a landowner's business facilities to *1359 the condition which existed before the taking. Replacement of property which was proven to be unique and indispensable was held to be an appropriate remedy in Constant.
Where the landowner challenges the amount the DOTD deposits for compensation, a greater value must be proven by a preponderance of the evidence. Dakin & Klein, Eminent Domain In Louisiana 371 (1970). Proof of economic loss may be determined by various methods, and it may exceed the market value of the property. However, the method employed for proof of loss must demonstrate by a preponderance of the evidence that an actual loss was sustained by the business because of the taking. In addition, the award may reflect the economic effect of protracted judicial proceedings. Constant.
Where an expert's well-reasoned testimony supports an award of damages, where it is uncontradicted and, particularly, where it is accepted by the trier of fact, the property owners should prevail. City of Shreveport v. Standard Printing Co., 441 So.2d 737 (La.1983).

CONCLUSION
The jury's decision to award economic damages sustained by the Dietrichs' slaughterhouse business and cattle-raising operation was not an abuse of discretion. It was supported by uncontradicted expert testimony. However, the jury erred in basing its award of future economic loss on the life expectancy of Roger Dietrich. Absent special circumstances, a property owner cannot retire for life from the taking of a business. A more reasonable time limit for future economic losses is necessary.
Determining a fair date for termination of the economic loss award is difficult, because the western section of the property is still inaccessible for most of the year. However, by July of 1991, the Dietrichs should be able to restore access to the western section of their land and resume some cattle raising, if they choose to do so. Allowing slightly more than a year from the conclusion of the litigation to make a decision and take necessary steps appears fair to all parties. This will, of course, necessitate duplication of their facilities. Taking Solomon's median estimate, just compensation for the new facilities would be $40,000. Having proved the amount of past and future economic losses sustained by the cattle-raising operation, the Dietrichs are entitled to receive $11,700 per year from trial in July, 1987 until July, 1991, as well as their losses from date of taking until date of trial.
Expert testimony by Waskom proved an annual loss to the slaughterhouse of $9,605. The amounts used by Waskom in his calculation were based on his monthly accounting records for the slaughterhouse. The DOTD introduced no evidence to contradict Waskom's testimony, and the jury did not abuse its discretion in relying on Waskom's testimony. For economic losses suffered by the slaughterhouse, the Dietrichs are entitled to recover $9,605 per year from trial in July, 1987 until July, 1991, as well as their losses from date of taking until date of trial.
Although Thames' expert testimony was based on reports which are not in the record, an expert may base his opinion upon data known to him before trial. LSA-C.E. art. 703. Since Thames' testimony was uncontradicted, the jury was entitled to rely on it as proof of the economic losses suffered by the cattle-raising business.[11]
In sum, the Dietrichs are entitled to the following past and future economic damages for injury to their businesses:

Past damage to slaughterhouse
and cattle-raising operations: $85,220[12]
Loss from forced sale of cattle: 39,700
Future damage to slaughterhouse
and cattle-raising operations: 85,220
Necessary improvements to western
parcel: 40,000
 ________
Total $250,140

For the foregoing reasons, the judgment of the court of appeal is reversed insofar as it failed to recognize the right to receive compensation for economic damage sustained by the landowners' businesses resulting from the expropriation. The judgment *1360 of the jury is reinstated insofar as it awarded the landowners economic losses sustained by the landowners' businesses because of the expropriation. The judgment of the jury awarding past economic damages to the slaughterhouse and cattle-raising businesses is amended to reflect the correct sum of $85,220.[13] The judgment of the jury awarding future economic losses is also amended to reduce the time limit to four years from the date of trial.

DECREE
For the reasons assigned, it is ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Leonard Melvin Dietrich, Roger Dietrich and Guinevere Martin Dietrich and against the State of Louisiana, Department of Transportation and Development, for the sum of $250,140.
It is further ORDERED, ADJUDGED AND DECREED that the court of appeal judgment affirming the awards of $53,305 for the taking of the Dietrichs' property and $132,569 for severance damages to the remainder of their property is affirmed.
It is further ORDERED, ADJUDGED AND DECREED that the Dietrichs are awarded legal interest plus 25% attorney's fees on all damages in excess of the deposit of $45,700.
All costs are taxed insofar as authorized by law against the DOTD.
REVERSED IN PART, AFFIRMED IN PART, AMENDED AND RENDERED.
CALOGERO, J., concurs.
LEMMON, J., dissents in part and assigns reasons.
Justice LEMMON, dissenting in part:
I agree that the landowners are entitled to recover for the loss of business profits as part of "the full extent of the loss" resulting from the expropriation. However, recovery of the loss of business profits should be limited to the reasonable period of time required for the landowners to reestablish their business operations in another location within suitable proximity of their slaughterhouse.[1]
The majority apparently determined that four years was a reasonable period of time for reestablishing the business, but awarded the loss for eight years (four years from the date of the 1983 taking to the date of 1987 trial, plus four years after the date of trial). The reasonable period of time for the landowners to reestablish their business operations should begin in July, 1983, when the Department filed the expropriation and deposited $48,700 into the court registry to compensate the landowners for the property taken.[2]
Even if it is assumed that the sum of $21,305 per year fixed by the majority is a proper assessment of the annual loss and that four years is a reasonable period of time for reestablishing the business, then the award of this court is twice the amount due for loss of business profits and should be reduced by at least $85,000.[3]
NOTES
[1] La. Const. of 1974, Art. I, § 4.
[2] State, DOTD v. Dietrich, 548 So.2d 1215 (La. 1989).
[3] Leonard Melvin Dietrich, Roger Dietrich and Guinevere Martin Dietrich.
[4] Tr. 131.
[5] Tr. 373.
[6] 544 So.2d 675 (La.App. 3d Cir.1989).
[7] It is undisputed that this award was a duplication.
[8] La. Const. of 1974, Art. I, § 4.
[9] Record of the Louisiana Constitutional Convention of 1973 (Louisiana Constitutional Records Commission, Baton Rouge, (1977): Vol. 1, p. 86; Vol. 6, pp. 1031, 1032, 1063-66; Vol. 7, pp. 1239-1243; Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 15-16 (1974); Jenkins, The Declaration of Rights, 21 Loy.L.Rev. 9, 23-24 (1975).
[10] Jenkins, supra, note 9.
[11] LSA-C.E. art. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
[12] The jury awarded $99,600 and Thames estimated $99,145, but $85,220 is the correct amount.
[13] See supra, note 12.
[1] The property on which the slaughterhouse is located is in a different area from the expropriated property on which the cattle farm is located, and was not affected by the taking. There is no suggestion that the present location is unique in nature or indispensable to the conducting of the business operations, or that other land suitable for plaintiff's cattle farm is not available for sale or lease in the general area. See State through Department of Highways v. Constant, 369 So.2d 699 (La. 1989).
[2] The majority appears to base its decision to begin the four-year period from the date of trial on the fact that the Department has still not paid the full amount due in excess of the original deposit. However, the thing awarded for damages for delay in payment under La.C.C. art. 2000 is interest, and the landowners are not entitled to both interest and a longer period for reestablishing the business operations because of the delay in payment. There is not suggestion in the record of any reason why the landowners could not have leased or bought other property in the area, within a reasonable period after receipt of the deposit, for use in relocating the cattle farm.
[3] I tend to believe that both the sum of $21,305 per year (which apparently represents gross profits) and the period of four years are excessive. The landowners also derived some profits from their continuing cattle operations. Moreover, part of the award by this court may be duplicative of the award for severance damages, and the award for damages to the slaughter-house operation, on different property and under different ownership, may be questionable.

The overall excessiveness is demonstrated by the fact that landowners paid $303,000 for the 357-acre tract about two years before the taking, and this court has now awarded $250,000, in addition to the $53,305 for the forty-seven acres taken and $132,569 for severance damages (a total without interest of over $435,000), while the landowners still own over 300 acres of property valued by their own appraiser at about $300,000.