BOWES, Judge.
The State of Louisiana, through the Department of Transportation and Development (hereinafter “DOTD”), appeals a judgment of the district court in favor of plaintiffs, Carroll LeBlanc Constance, wife of/and Gerald Constance, and Cleary Bicycle, Moped and Go-Cart Center, Inc. (hereinafter called “Cleary”) in the amount of $108,153.00, plus $20,000.00 in attorney fees, plus expert witness fees. We affirm the judgment (in toto) as explained in a particularly well written and soundly reasoned opinion of the district court, as follows.
PROCEDURAL FACTS
Mr. and Mrs. Constance and Cleary filed suit in the Twenty-Fourth Judicial District Court for damages and losses sustained due to the redesign and construction of the exit ramp at Clearview northbound. Made defendants were DOTD, Pepper & Associates (engineers who designed construction signing) and contractors T.L. James and Louisiana Paving, Inc. All claims except those against DOTD were dismissed or settled prior to trial. In the suit, plaintiffs claimed that they lost business income and that their building was devalued because of a construction project and redesigning of the traffic routes at the Clearview Parkway North and Interstate 10 Interchange. Following trial against DOTD, the trial judge determined that plaintiffs proved by a preponderance of the evidence that they suffered both a devaluation of property and a loss of sales. The court determined that the loss of profits due to construction and redesign was $53,153.00, using a “reasonable time period of loss” of two years. It was further determined that the property had a loss of $55,000.00 in value, for a total of $108,153.00. The Court awarded these amounts as damages to plaintiffs, as well as attorney fees of $20,000.00 based on the amount of legal work involved, the expertise of plaintiffs’ attorney, his success, and “other criteria set forth by law.” Expert witness fees in the amount of $1,400.00 were also assessed against defendants.
DOTD appeals, assigning as error the following:
(1) The trial court committed error when it failed to apply the principle of law that the plaintiff owner is obligated to tolerate certain inconveniences resulting from the lawful use of another neighbor’s property.
(2) The trial court was manifestly erroneous in awarding $53,153.00 for loss of profits based on uncorroborated self-serving evidence.
(3) The trial court erred in awarding $55,000.00 for devaluation of property when, by plaintiff’s own testimony, the property continued to be equally productive.
(4) The trial court erred in granting attorneys fees not provided by statute or contract.
*368 Appellee answered the appeal averring that the court erred in limiting his recovery to the period of time from August, 1981 through July, 1983.
EVIDENCE AND TESTIMONY
Mr. and Mrs. Constance purchased the property at 3001 Clearview Parkway, Me-tairie, Louisiana in 1978 and constructed a commercial building thereon for a total of $150,000.00. Cleary began operations in that location later that same year. In August of 1981, the State, through DOTD, was issued a work order to realign the westbound exit ramp of Interstate 10 to Clearview Parkway northbound, including a direct connection from the ramp to Frontage Road. “Cleary” is located on the I — 10 Service Road at its intersection with Sanford Street “tucked” immediately behind Clearview Shopping Center. The property and business are completely surrounded by a fence from the shopping center.
DOTD, in requesting permits from the Federal Highway Administration, classified the project in a letter dated March 19, 1979 as a “non major” action which would not substantially alter social, economic, or environmental conditions or essentially change traffic patterns in the area. “The project should have no impact on land use in the area either.” Therefore, the DOTD concluded that an opportunity for public hearing would not be afforded. There would not, the State averred, be displacements of residences or businesses. At that point, DOTD concluded that “only a narrow strip of additional right-of-way will be required adjacent to the northbound roadway of Clearview Parkway, between Veterans Boulevard and the Clearview interchange.”
By the time the project actually began in 1981, Cleary had been in operation for several years. There is apparently also a radio broadcasting station and a medical testing laboratory in the area, but no other retail businesses dependent upon customer access like the plaintiffs are. Constance testified that he knew nothing of the project until he noticed the surveyors in front of his store and upon questioning them, learned of the situation. Construction actually began on September 1, 1981.
Prior to construction, there were four principal methods of access to “Cleary”:
(1) From I — 10 from the East (Metairie and New Orleans) traffic could exit at Clearview north and turn right onto Frontage Road, then directly into the “Cleary” parking lot;
(2) From the South, traffic going north on Clearview would turn right onto Frontage Road;
(3) Westerly traffic from Kenner was able to exit northbound on the Clearview exit and turn right onto Frontage; and
(4) Traffic from the North from Pontchartrain Lake was able to proceed southbound on Clearview and turn left across Clearview just south of Veterans Boulevard onto Frontage Road.
Two other, but more circuitous, routes through the Clearview Shopping Center to an exit on Woodland, then on to Sanford; and Frontage Road from Causeway were also available.
There was testimony from Russell Doyle, formerly a project engineer of DOTD, that at the beginning of construction, Frontage Road was originally changed to one-way traffic going in an easterly direction, but that motorists ignored the one-way signs and therefore, the road was finally blocked on Sanford at some distance beyond the bicycle shop. He further testified that according to his log books, “local traffic” was permitted to go through the “detours.” However, Mr. Doyle agreed that his log books had no specific entries regarding the actual placing of signs by DOTD on the project in question.[1] Aswah Lam, a traffic engineer at DOTD, testified that he reviewed the sign plan prepared by a consultant hired by DOTD (Pepper and Associates) for approval. According to his testimony, economic impact is considered in such traffic engineering and local traffic is *369 to be allowed during such projects. However, Mr. Lam had nothing to do with the actual placing of the signs either and did not testify regarding the sign plan actually employed at these intersections.
Lloyd Gautreaux was the district traffic operations engineer for DOTD in 1981 and 1982. He testified, as did Mr. Russell, that motorists ignored the one-way signs on Frontage Road, and as a result, a barricade was placed in the roadway just beyond Kingman Street (westbound); barricades were also placed in the southbound roadway off Woodlawn and in the westbound lane of Sanford. This was supposed to redirect traffic into a one-way system which would eliminate the possibility of head-on collisions on Frontage Road. While the barricades were supposed to have been placed in one lane only, the department deleted any “Local Traffic Only” signs. Referring to Clearview Shopping Center motorists, Gautreaux stated:
... there’s a lot of motorists coming out of the Sears’ shopping center that are not local traffic in the sense, that the only reason there is that they’re at the shopping center and most of them are looking to go to Clearview Parkway. So, we didn’t want to give them the idea that perhaps they could get through by going up Sanford and cutting over to the Clear-view Parkway so we deleted those signs and we left the left lane open and available for workers that had to get to work.
According to Mr. Gautreaux, during Phase I of the construction, primary access to Frontage was from Clearview; in Phase II, Frontage was closed at Clearview, and local traffic signs could be restored on Frontage. There were no DOTD records, however, to indicate the actual signs which appeared in Phase II.
Mr. Constance testified that Frontage was barricaded at Clearview and also near Woodlawn; additionally barricaded was Sanford near Woodlawn, (Sanford leads to plaintiffs’ property from Woodlawn). See Appendix I. Photographs entered into evidence depicted barricades and heavy equipment right off Clearview on Frontage Road just before plaintiffs’ building.
Constance stated that even before any signs were placed the heavy equipment was left on the road; and further while the pictures were not taken until January of 1982, that the pictures represent the types and placement of barricades that began to impact his business in September of 1981. Constance stated that six engineers came into his store in the very beginning and asked if there was a problem. Constance explained the sign and barricade problem and they agreed to take care of it. According to Constance (and there was no evidence to refute this) they did take care of the problem, only to have the signs and barricades reappear again the next day. The major signs of which he complained were on Sanford; photographs depicted “Do Not Enter” signs and a barricade with a “Road Closed” sign. Plaintiff verified there were never any “local traffic” signs. During construction plaintiff would place a poster on the barricade to alert potential customers that they could come around, but it was removed numerous times. On weekends he would move the barricade, but unless he took these steps on a daily basis, he would not have any customers. According to Constance, the barricades, as placed, either completely blocking or straddling both lanes cut off access to his store completely during construction.
With regard to damages, Constance testified that the peak period of his business is the last quarter of each year when people begin to make Christmas purchases. He had purchased his Christmas inventory pri- or to September 1st, the beginning of (and therefore his knowledge of) the construction. In addition, he and his wife a,re also the stockholders of Cleary East, a bicycle store located in St. Bernard Parish.
Constance owns the bicycle shop personally and leases it to Cleary, with the rental amount figuring the rent by the square foot. Cleary also pays a salary to Constance. Constance testified that even though the economy in St. Bernard is middle to lower income, when Kaiser shut down in 1982, the economy there began to struggle severely; while the Metairie economy is more middle to upper class and *370 stable. Nevertheless, in St. Bernard the sales pattern maintained a steady (if small) growth whereas the Metairie store sales fluctuated greatly. Constance stated that customers continue to the present day to complain about access to the store — that it is easy to see but difficult to actually get to. He estimated that the current design of the road, not being able to turn right on the service road, as previously, eliminated 50% of the access to the store.
Anton Yrle, a certified public accountant, was the accountant for “Cleary” since 1986. Although not employed by Cleary in 1981, he had access to the prior records. He determined the average sales prior to construction and based on a normal 3.6% increase in such sales determined that the Cleary store in Metairie lost business. The 3.6% figure was used because Cleary East experienced that percentage of growth during the same year. Yrle determined that there was a loss of .gross sales from 1981 through 1986 of $852,578.00. On this study he used the fiscal year ending July, 1980 as a base year because going back two years “would be a good indication of what the store was doing.” At the request of counsel for the state, and the direction of the court, Yrle prepared a report using the fiscal year ending in 1981 .as the base year. At that point he determined lost gross profit from fiscal 1982-1986 to be $48,098.00. Other calculations were made by Yrle using different base years with results ranging from $154,587.00 to $376,-191.00.
Ray Ladouceur, testifying for the defendant, used the income tax returns provided by Cleary for his computations. He determined that while sales did decrease during construction there was an increase in net profit in 1982 and 1981. He concluded that gross profit percentage also increased in fiscal 1982. Mr. Ladouceur used certain adjustments for increases in rental payments from Cleary and salary increases to Constance and finally for increased advertising costs in determining that there was no loss of profits but that there was, in fact, an actual gain.
Irving Eppling, recognized as an expert in the field of real estate appraisement and devaluation of property through expropriation, testified on behalf of Constance. Using two approaches, he determined that the loss of value to the building based on potential sales as a rental loss was $63,-107.00; the loss of rental value of the building because the construction was approximately $50,000.00; and Eppling, splitting the indications, estimated the loss of real estate value at $55,000.00. He stated that prior to the construction the building had good access, but that afterward, direct access from Clearview and the Interstate access was lost, basically leaving the more circuitous routes described hereinabove. In his opinion, access was definitely permanently changed adversely. Mr. Ep-pling used data from 1980 through 1983, because, in his opinion, 1984 losses in real estate values also became attributable to a declining economy in general.
Carl Dowell was qualified as an expert real estate appraiser for DOTD. Using only a method of comparable sales in the immediate vicinity, he determined the diminution in value to be $17,710.00. Mr. Do-well agreed that the construction, while it did not deny access, made it “circuitous in terms of getting to the property”; however, he made an appraisal without considering the alteration of access.
ANALYSIS
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner[,] * * * [who] shall be compensated to the full extent of his loss.
La. Const.1974, Art. 1, Section 4.
In 1974, the Louisiana Constitution was re-worded to provide that an ‘owner shall be compensated to the full extent of his loss’ when land is expropriated by the state. Previously, a landowner could only receive the fair market value and any severance damages for property taken through expropriation. The change permits a landowner to remain in an equivalent financial position to that *371 which he enjoyed before the taking. State Through Department of Highways v. Bitterwolf 415 So.2d 196 (La.1982); State Through Department of Highways v. Constant, 369 So.2d 699 (La.1979).
State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990); also Dept. of Transp. & Dev. v. Traina, 537 So.2d 792 (La.App. 2 Cir.1989).
A taking or damaging of property can occur from the official act of expropriating a whole or partial tract of land or from inverse condemnation, which is when property is taken or damaged without the proper exercise of eminent domain. Reymond v. State, Department of Highways, 231 So.2d 375 (La.1970).
In inverse condemnation, the damage may occur not only to property which is physically invaded, but also to a separate and independent tract of land. Gulf States Utilities Company v. Comeaux, 182 So.2d 187 (La.App. 3 Cir.1966), quoted with approval in State, Department of Highways v. Garrick, 256 So.2d 111 (La.1971). However, when the damage is claimed to a parcel separate from that which is actually taken, the public body’s liability is limited to special damages which peculiarly affect that property and which are not sustained by the neighborhood generally. Garrick, supra; Comeaux, supra; see also, Ursin v. New Orleans Aviation Board, 506 So.2d 947 (La.App. 5 Cir.1987) rev’d on other grds., 515 So.2d 1087; Bowden v. State Dept. of Transp. & Dev., 556 So.2d 1343 (La. App. 3 Cir.1990) writ denied, 563 So.2d 879; Harrington v. Southwestern Electric Power, 567 So.2d 731 (La.App. 2 Cir.1990).
Parish of Jefferson v. Tassin, 594 So.2d 525 (La.App. 5 Cir.1992).
In an expropriation case the defendant has the burden of proving his claim to a legal certainty and by a reasonable preponderance of the evidence; speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment. R.S. 48:453; State Dept. of Trans. & Dev. v. Estate of Clark, 432 So.2d 405, 408 (La.App. 1st Cir.1983) citing State v. Levy, 242 La. 259, 136 So.2d 35, 43 (1961). If a public authority substantially interferes with the owner’s right of access, he has a constitutional right to just compensation for his loss; but where access is not substantially impaired or is impaired only on a temporary basis and/or the inconvenience to the owner is not peculiar to him, but general to the public at large, no recovery is allowed.
State, DOTD v. Pace, 588 So.2d 145 (La.App. 4 Cir.1991).
The owner of land abutting a public roadway has a property right to access that roadway. A public authority’s substantial interference with this right of access gives a landowner a cause of action pursuant to LSA-Const. Art. 1, Section 4 for just compensation. State ex rel. Gebelin v. Department of Highways, 200 La. 409, 8 So.2d 71 (1942); Mills v. State Department of Highways, 416 So.2d 957 (La.App. 2d Cir.1982), writ denied, 420 So.2d 173 (La.1982); Dickie’s Sportsman’s Centers, Inc. v. Department of Transportation and Development [477 So.2d 744 (La.App.1985) ] supra. In addition to the requirement that the impairment of access must be substantial, a plaintiff must show that this impairment is peculiar to his property and not sustained by the public generally-
Harrington v. Southwestern Elec. Power, 567 So.2d 731 (La.App. 2 Cir.1990).
The law pertinent to damages resulting to property absent an actual taking is set forth in Department of Highways v. Capone, 298 So.2d 94, as follows:
Our jurisprudence is settled to the effect that, even absent an actual taking, damages resulting to property from the construction of public improvements are compensable when such damages are special or peculiar to one’s property in particular, and are not general damages sustained by other properties similarly situated. Reymond v. State, Through the Department of Highways, 255 La. 425, 231 *372 So.2d 375 (1970), and authorities therein cited.
When there is no taking, damages which merely cause disturbance, inconvenience or discomfort, and which are an ordinary and general result of a public improvement, are not compensa-ble, but are held to be damnum absque injuria. Reymond, above.
In the absence of taking substantial impairment of ingress, when special and peculiar to claimant’s property, entitles an owner to compensation. Efurd v. City of Shreveport, 235 La. 555,105 So.2d 219, Patin, et al. v. City of New Orleans, et at, 223 La. 703, 66 So.2d 616; Harrison v. Louisiana Hiqhway Commission, 202 La. 345, 11 So.2d 612.
[[Image here]]
In Hebert v. State, Dept. of Hwys., 238 So.2d 372, 375 (La.App. 3d Cir.), writ denied, 256 La. 911, 240 So.2d 373 (1970), this court stated that there is special damage to property where the highway in front of property is discontinued or obstructed so that access to the property is made impossible. See also, Efurd v. City of Shreveport, 235 La. 555, 105 So.2d 219 (1958); Cucurullo v. City of New Orleans, 229 La. 463, 86 So.2d 103 (1956); State, DOTD v. Semp Russ Plantations, 529 So.2d 487 (La.App. 3d Cir.1988), Bowden v. State, Dept. of Transp. & Dev., 556 So.2d 1343 (La.App. 3 Cir.1990), writ denied 563 So.2d 879 (La.1990).
[The name of the circuits and the date of the citation were not given in the quoted material and were therefore left off here as these are exact quotes.]
The State cites Reymond v. State, Department of Highways, 231 So.2d 375 (La.1970) and State Through DOTD v. Chambers Inv. Co., 595 So.2d 598 (La.1992) for the proposition that under LSA-C.C. art. 668, the State’s construction activities resulted in “inconveniences” which must be tolerated. The codal articles read as follows:
Art. 667. Limitations on Use of Property-
Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Art. 668. Inconvenience to Neighbor.
Although one be not at liberty to make any work by which his neighbor’s buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors’s [neighbor’s] house, because this act occasions only an inconvenience, but not a real damage.
In Chambers, supra, the court stated:
We are not prepared to say that, in all cases, a landowner must prove an abuse of right of ownership before he may suppress or recover for a violation of Article 667 by a neighbor. But we think that in a case, such as the present one, in which there is no allegation or evidence of personal injury or physical damage to property, it is consistent with the principles of the Civil Code and our jurisprudence to require proof of the presence of some type of excessive or abusive conduct to hold a landowner responsible under Article 667.
Thus, the limitations established by Article 667 upon the State’s use and enjoyment of its land, and the requirements imposed by Article 668 on the claimant to tolerate some inconvenience, also serve to mark the boundaries of each party’s respective right to develop its land. Because the claimant’s right to enjoy its property is not absolute but extends only as far as the law allows it, La.C.C. art. 667-669, unless the obligations and limitations of neighborhood are violated, the property rights of the claimant have not been violated. In other words, as long as the activities on the State’s land do *373 not exceed the level of causing the claimant ‘some inconvenience,’ there can be no taking or damaging of the claimant’s property right.
Reymond, supra and Chambers, supra require that the landowner must prove the construction by the State amounts to more than an “inconvenience” and enters the realm of “damages.” The court in Chambers, supra, decided that delay of development of Chambers’ property were not recoverable damages, but merely an inconvenience to be tolerated under LSA-C.C. art. 668. The above quoted jurisprudence, most notably Dietrich, supra, Pace, supra, Harrington, supra, and Bow-den, supra, make it clear that damages, such as those suffered by the plaintiff in the present case, are compensable, exceeding the level of inconvenience.
Additionally, it should be noted that the evidence produced at trial indicates that the State may well have engaged in some abuse of conduct in failing to take plaintiffs’ position in business into consideration, and failing to adequately provide for it afterward.
Here we take cognizance of the letter from the State referred to previously which stated that no public hearing was necessary, that the project should have no impact on land use in the area, and that traffic patterns in the area would not be essentially altered. Clearly, this was a miscalculation on the part of DOTD. Further, it appears from the testimony that while DOTD may have intended to attempt to allow some limited local traffic, such signs were either never utilized or were put up for very limited periods of time. While the concerns of DOTD are clearly beneficent, it appears to this Court that traffic could have been re-routed by DOTD in a way so as to lessen the impact on plaintiff’s business while still protecting the public at large.
Applying all the applicable law and jurisprudence to the present case, we find no error in the determination by the trial court that plaintiff suffered compensable damages. There was sufficient evidence to prove that Cleary was the only retail business in the area to be impacted by the construction and therefore, the damage was peculiar to plaintiffs. There were no other properties similarly situated.
Further, it is clear that during the period of construction, access to plaintiffs’ property was severely restricted, and since the completion of the project, access continues to be substantially impaired. The damages go beyond ordinary inconvenience or disturbance, and while access is obviously not impossible, it is far more difficult to get to Cleary following construction. While it is true that the property remains highly visible from the Interstate and from Clear-view, it is also true that the major artery of connection, almost directly from Clear-view, is now non-existent. Under the law cited and the circumstances of the case, the court properly awarded damages in favor of plaintiffs.
With reference to the amount of damages we hold that the law as espoused by Louisiana courts, including this Court is as follows:
The measure of damages in expropriation cases is the market value of the land taken plus severance damages to the remainder, if any. State, DOTD v. Crawford Business Trusts, 538 So.2d 1078 (La.App. 3 Cir.1989), writ denied, 542 So.2d 1381 (La.1989). In calculating severance damages, the court must analyze the diminution in the market and rental value of the property immediately before and immediately after the taking. The same analysis is used to determine the damages in an inverse condemnation case. See Reymond, supra; Bowden, supra.
Tassin, supra.
In Dietrich, supra, cited by the trial court, our Supreme Court stated thusly:
Article I, Section 4, does not specify how to fully compensate a landowner whose property is taken. Delegates to the Constitutional Convention explained that full compensation should include moving costs, costs to relocate, inconvenience, and loss of profits from takings of business premises. Where economic *374 losses suffered by a business have been proven, damages for incidental and consequential loss must be awarded to fully compensate the owner. Article I, Section 4, provides that the landowner should be compensated for ‘his loss’ not merely the loss of the land.
Constant decided that full compensation under Article I, Section 4, included restoration of a landowner’s business facilities to the condition which existed before the taking. Replacement of property which was proven to be unique and indispensable was held to be an appropriate remedy in Constant.
... Proof of economic loss may be determined by various methods, and it may exceed the market value of the property. However, the method employed for proof of loss must demonstrate by a preponderance of the evidence that an actual loss was sustained by the business because of the taking. In addition, the award may reflect the economic effect of protracted judicial proceedings. Constant.
Where an expert’s well-reasoned testimony supports an award of damages, where it is uncontradicted and, particularly, where it is accepted by the trier of fact, the property owners should prevail. City of Shreveport v. Standard Printing Co., 441 So.2d 737 (La.1983). [Emphasis supplied].
Here, the trial court accepted and relied on the testimony and calculations of plaintiffs’ economic expert in finding the devaluation of property to be in the amount of $55,000.00. While Mr. Dowell’s appraisal reached a different figure, we find that the testimony of Mr. Eppling was particularly well-reasoned and gave a more rounded picture of the real estate value of plaintiff’s property both before and after construction.
We find no abuse of discretion and no manifest error in the acceptance of this expert and his testimony by the trial court (which is, in any case, not absolutely bound by the opinion of any expert).
The settled jurisprudence is that expert testimony is to be weighed by the trier of fact in the same manner as other evidence.
Williams v. Anderson, 456 So.2d 666 (La.App. 5 Cir.1984); Cooper v. Olinde, 565 So.2d 978 (La.App. 1 Cir.1990).
In addition, our Supreme Court has stated:
In expropriation proceedings, much discretion is granted to the trier of fact. The trial judge’s factual determinations as to value of property and severance damages, and his evaluation of and weight given to testimony of expert witnesses, will not be disturbed on review in the absence of manifest error. State, Dept. of Transp. & Dev. v. Stumpf, 519 So.2d 279 (La.App. 5th Cir.), writ denied, 520 So.2d 753 (La.1988).
State Through DOTD v. Estate of Davis, 572 So.2d 39 (La.1990).
Therefore, we find no error in the determination by the trial court that plaintiffs’ loss of property value was $55,000.00 based on the opinion of Mr. Eppling.
With regard to loss of profits, it is clear under Dietrich, supra, that the court had the authority to award damages for lost profits. Both parties object to the award made by the judge in this respect, relying on their respective expert’s testimony and opinion to demonstrate error.
The trial judge is not bound by expert testimony. He may substitute his own common sense and judgment for that of an expert witness where in the opinion of the trier of fact such substitution appears warranted by the testimony as a whole.
Williams, supra.
Furthermore, expert opinions are not ordinarily conclusive and are generally regarded as advisory in nature. State Dept. of Transp. & Dev. v. Stumpf, 519 So.2d 279 (La.App. 5th Cir.1988), writ den. 520 So.2d 753 (La.1988).
As stated by Mr. Yrle in his report to the court: “... not all experts agree on how to arrive at the amount considered to be lost gross profit.”
*375 The court heard the testimony of Constance, as well as that of both economists, before determining that plaintiff did indeed suffer loss of business and profit due to the construction. After reviewing the record, we do not find that such a determination was clearly wrong. Rather than experiencing a modest 3.6% increase in the fiscal year ending July, 1982, Cleary suffered a rather dramatic loss. While Cleary recovered somewhat from that in 1983, it was still below the earlier 1980 levels and obviously did not reach the projected 3.6% increase in 1983. The plaintiffs established with reasonable certainty that such an increase should have been experienced by Cleary (since that rate of growth was actually experienced by the less affluent St. Bernard store), and the most plausible explanation offered at trial was the confusion on the part of the customers caused by construction. Also, we do agree with the trial court that such losses should not extend beyond 1983, inasmuch as the testimony indicates strongly that the economy in general began to decline after that date.
Additionally, “Absent special circumstances, a property owner cannot retire for life from the taking of a business. A more reasonable time limit for future economic losses is necessary.” Dietrich, supra.
We find that two years, as found by the learned trial court, is a reasonable time period in this case.
In determining the actual loss of profits, the jurisprudence holds that an award for such loss cannot be based upon speculation and conjecture; yet the trier of fact has much discretion in determining such damages where the evidence clearly shows the damage is proven but not to a mathematical or legal certainty. See Jordan v. Travelers Insurance Company, 245 So.2d 151 (La.1971); also Rosenblath v. Louisiana Bank & Trust, 432 So.2d 285 (La.App. 2 Cir.1983).
In the present case, the court found that the gross profit category most reliably represented the plaintiffs’ economic status, and after examining the record we find no manifest error in such determination. Gross profit is the result of gross sales minus costs of sales. The court determined that the compensable loss suffered by plaintiffs was the difference between the actual gross profits and what the gross profits should have been using the 3.6% increase. That 3.6% figure is a reliable, even if conservative, indicator of lost profits in this particular case.
The court averaged the costs of sales for the years 1980-81, rather than using the costs shown by either expert, to set off the “artificial difference caused by the prepurchase of part of the inventory for 1982 in 1981.” (Reasons for Judgment).
Where there is a legal right to recovery but the damages cannot be exactly estimated, the courts have reasonable discretion to assess same based upon all the facts and circumstances of the case_ This latter principle is also applicable, where the fact of loss of earnings or earning power, past or future, is proved, but not any exact amount.
Jordan, supra.
The facts of this case show that because there was a prepurchase of inventory in 1981 prior to construction, and that due to economic conditions set up by the construction, plaintiff was obliged to “live” on this inventory for quite some time. The decision of the judge to average those costs was reasonably within his or her discretion as discussed in Jordan, supra.
In fixing the losses, the court used figures for gross sales supplied by the defendant's economist, also a matter reasonably within his or her discretion. The calculations made by the trial judge were as follows:
*376 Taxable year ending 7/31/81 7/31/82 7/31/83
Gross Sales $223,207.00 $186,683.00 $241,055.00
Costs of Sales $107,224.00 $107,224.00 $129,026.00
Gross Profit $115,983.00 $ 79,459.00 $112,029.00
Projected 3.6% increase $120,158.00 $124,483.00
Loss of Profits ($ 40,699.00) ($ 12,454.00)
Based on the facts and the foregoing jurisprudence, we find that the award for loss of profits as calculated by the astute trial court was reasonably supported by the evidence, was within his or her discretion, and consequently we find no manifest error in that aspect of the judgment either.
Finally, with regard to attorney fees, LSA-R.S. 13:5111(A) states, in pertinent part:
A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding.
We stated in Howard v. Louisiana Power & Light Co., 583 So.2d 503 (La.App. 5 Cir.1991), that the above statute specifically authorizes an award for attorney fees where a governmental authority “takes” property by a method other than expropriation. “Taking” can occur from inverse condemnation. Tassin, supra; Reymond, supra. See also Pillow v. Board of Commissioners, 425 So.2d 1267 (La.App. 2 Cir.1982). Accordingly, we find that plaintiffs are entitled to an award for attorney fees in this proceeding and that the amount awarded was reasonable and proper under the circumstances of this case.
Attorney fees in expropriation cases are discretionary with the trial court. A number of factors should be considered including the complexity of the case, the responsibility required of the attorney, his skill, knowledge and diligence, the result obtained and the work performed.
State, Through DOTD v. Davis, supra.
DECREE
For the foregoing reasons, the judgment of December 19, 1991 is affirmed in every respect.
AFFIRMED.
*377 [[Image here]]

. There was a joint stipulation that several signs were actually added to the project which did not appear on the design plans drawn by the state, although the additional signs were put in at the request of Mr. Doyle.