CALOGERO, Chief Justice.*
We consider in this inverse condemnation case whether restricted access to property with accompanying reduction in property value and temporary loss of business income triggers the entitlement to compensable damages. Concluding that it does not, we *1153 reverse the decisions of the District Court and the Court of Appeal, which awarded damages and attorney’s fees to plaintiffs, 615 So.2d 365 (1993).
In the late 1970’s, the Office of Highways of the Department of Transportation and Development for the State of Louisiana (“DOTD”) sought to reconstruct the westbound 1-10 exit ramp to Clearview Parkway and the adjoining service road network in Jefferson Parish. Studies indicated that traffic on the ramp was expected to increase from 6,580 to 11,300 vehicles per day between 1978 and 1998. The planned improvements were designed to provide greater storage length between the ramp terminal with Clearview Parkway and the Veterans Boulevard intersection as well as a direct connection from Ramp 20 to the Service Road that parallels 1-10 on the north side. In seeking the concurrence of the Federal Highway Administration in the project, the state engineer noted that only a narrow strip of right of way adjacent to the northbound roadway of Clearview Parkway between Veterans Boulevard and the Clearview Parkway Interchange would be required. The engineer recommended that, pursuant to the Federal-Aid Highway Program Manual, the 0.38 mile project, which would not require the displacement of any residences or businesses, be classified as a “nonmajor action.”
The DOTD entered into a professional service agreement with Pepper & Associates, Inc. to assist in the preparation of construction drawings and specifications for modifications to the I-10/Clearview Interchange. To perform the construction phase of the project, the DOTD contracted with T.L. James & Co., Inc. and Louisiana Paving Company, Inc. On August 17, 1981, the work order was issued, but construction of the project did not begin until September 1, 1981. Pursuant to the Notice of Final Acceptance recorded in the mortgage records of Jefferson Parish, the project was completed by the contractor and accepted by the DOTD on March 23,1982, less than seven months after commencement of the work.
Before the project, property near the intersection of Clearview and the Service Road could be reached by four primary approaches, as follows:
1. from the north on Clearview Parkway. A southbound vehicle could turn left, cross Clearview northbound traffic just south of Veterans Boulevard onto the Service Road.
2. from the east on 1-10. A vehicle traveling from New Orleans and Metairie would exit the northbound ramp onto Clearview Parkway, proceed north briefly, and turn right onto the Service Road.
3. from the south on Clearview Parkway. A northbound vehicle could turn right onto the Service Road.
4. from the west on 1-10. A vehicle traveling from Kenner and LaPlace would take the Clearview-North exit, proceed north on Clearview, and turn right onto the Service Road.
After the redesign of the exit ramp, the approaches to the northeast quadrant of the Clearview Interchange were modified in part, so that just two of the above described approaches were not adversely affected. Although approaches 1 and 2, described above, either remain unchanged or even enhance access to the northeast quadrant, approaches 3 and 4 now require a more circuitous route after the completion of construction. From the south on Clearview Parkway or from the west on 1-10 (turning north onto Clearview), a vehicle is prohibited from making a right turn from Clearview onto the Service Road. To reach the northeast quadrant from these approaches then, a driver may either (a) drive north on Clearview to Veterans, turn right on Veterans, turn right into the shopping center, travel through the shopping center parking lot to Sanford Street, and travel up Sanford to the Service Road; (b) drive north on Clearview to Veterans, turn right on Veterans, turn right on Kingman Street, turn right on Trenton Street, turn right on Woodlawn Avenue, and turn right on Sanford to the Service Road; or (c) drive north on Clearview past Veterans, make a “U” turn, and proceed south to the left-turn lane onto the Service Road.
Plaintiffs, Carroll LeBlanc, wife of/and Gerald Constance (“Constance”), own the land and improvements bearing the municipal address 3001 Clearview Parkway, Metair- *1154 ie, but actually located at the corner of the I-10 Service Road and Sanford Street, within the northeast quadrant of the Clearview Interchange and adjacent to the project. The property, which they lease to the corporate plaintiff, Cleary Bicycle, Moped & Go-Cart Center, Inc. (“Cleary”), was acquired on March 24, 1978 for a purchase price of $50,-000.00. Simultaneously, Constance executed a collateral mortgage in the amount of $150,-000.00 to secure capital for construction costs. The building was complete by September 1, 1978, when Cleary, a business engaged in the sale and service of bicycles and accessories, both juvenile products and bikes in the $150 to $1,000 range for an up-scale, middle to upper income market, opened at this location.
According to Gerald Constance, who testified as the president of Cleary and as the owner/lessor of the property, the seven months of construction and the permanent re-routing of traffic has resulted in substantial loss of sales to the business as well as a permanent devaluation of his property. During construction, the location of barricades and re-routing signs limited access to his property, which is located across Sanford Street from a biochemical laboratory and near a radio station. Furthermore, photographs introduced as evidence at the trial reflected the storage of road building and earth moving equipment between the Clear-view entrance to the Service Road and the business. As evidence of the effects of construction on the business, a six page list of customers, who experienced difficulty in reaching the bicycle shop during the period of construction, together with the deposition of one of these customers, were offered by plaintiffs. Gerald Constance admitted, however, that, at the beginning of the project, a group of engineers from the Highway Department actually solicited his complaints and took action with regard to both the signing and the barricades.[1] Notwithstanding this effort by the DOTD’s agents to relieve the situation, both the signs and the barricades consistently reappeared. Furthermore, plaintiffs contend that, even after the construction phase, the substantial alteration to the traffic patterns in their quadrant of the Clearview Interchange have limited access to their property despite its high visibility from the major connecting artery.
In addition to the testimony of Gerald Constance, the corporation’s financial information for the taxable years ending 7/31/80 through 7/31/88 was introduced with analysis by Cleary’s accountant employed since 1986 and by a CPA retained by the DOTD to review the information. Although the relevance of figures is contested in terms of the profit and loss analysis, it is undisputed that gross sales during the year of construction (the taxable year ending 7/31/82) of $186,683 were lower than both the immediately preceding year ($223,207) and the immediately following year ($241,055). On the other hand, it is undisputed that Constance received increased income each year during the relevant period, from the taxable year before to the taxable year following construction, August 1,1980 — July 31,1983, from salary as president of Cleary ($19,000 to $24,600 to $26,000) and from the rent he received as owner of the property leased to Cleary ($24,-000 to $34,300 to $33,400).
Appraisers for Constance and the DOTD also testified concerning the alleged devaluation of the property itself. Both agreed that the highest and best use of the property had not changed. According to the plaintiffs’ expert, the property retained its commercial attributes because of its proximity to the shopping center and high visibility “even though it’s a little harder to get to.” Nevertheless, he maintained that the rental value of the property has been reduced since the income stream is probably affected by the reconstruction of the Interchange and the Service Road. Therefore, relying primarily on the estimated rental differential the property would likely command after the con *1155 struction of the project, plaintiffs’ appraiser concluded that the loss to the property’s value as a result of the changed access was $55,000. Using comparables from sales, the DOTD’s expert testified that the improvements, which retained their highest and best use, would have suffered no diminution in value. He agreed, however that the land had been diminished in value, but by only $17,-710.
Alleging both the loss of sales and the devaluation of the property, Constance and Cleary filed suit in the 24th Judicial District Court for the Parish of Jefferson on August 2, 1982 against the DOTD as well as those directly involved in the design and construction of the project. T.L. James & Co., Inc. and Louisiana Paving Co., Inc. settled all claims brought by plaintiffs and were dismissed from the lawsuit by order of the court dated December 26, 1989. In a judgment rendered with reasons on December 19,1991, the trial court found that the plaintiffs proved by a preponderance of the evidence that they suffered both a devaluation of their property value and a loss of sales. Relying on State, Department of Transportation and Development v. Dietrich, 555 So.2d 1355 (La.1990), an expropriation proceeding rather than a ease of inverse condemnation,[2] the trial court concluded that, since economic losses had been suffered by a business, damages must be awarded to fully compensate the owner. Accordingly, the court rendered judgment in favor of Constance and against the DOTD in the sum of $55,000, plus attorney’s fees of $10,000, and in favor of Cleary and against the DOTD in the sum of $53,153, plus attorney’s fees of $10,000. Defendant’s motion for a new trial was denied on February 20, 1992.[3]
The Court of Appeal affirmed the judgment of the trial court in all respects. That court found that the damages suffered by the plaintiff in this ease, which were caused by the restriction of access to their property, exceeded the level of ordinary inconvenience and are peculiar to plaintiffs, since Cleary was the only retail business in the area to be affected by the construction. Relying on Dietrich as well as State, Department of Transportation and Development v. Pace, 588 So.2d 145 (La.App. 4th Cir.1991) (another expropriation case), Harrington v. Southwestern Electric Power, 567 So.2d 731 (La.App. 2d Cir.1990), (reversed exceptions of no cause of action and no right of action since plaintiffs petition could reasonably be interpreted as claiming that the impairment of access was peculiar to his property) and Bowden v. State, Department of Transportation and Development, 556 So.2d 1343 (La.App. 3d Cir.1990) (involved a complete, permanent loss of access as a result of highway construction), the Court of Appeal concluded that these damages are compensable. The Court of Appeal also agreed with the trial judge that attorney’s fees are authorized in an action based on inverse condemnation pursuant to La.Rev.Stat.Ann. § 1'3:5111(A) (West 1991).
Although our state constitution recognizes that every person has the right to acquire, use and dispose of private property, this right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. La.Const. art. I, § 4 (1989). In fact, general interest takes precedence over that of individuals, and any individual must yield any particular property to the community, should it become necessary for the general use. La.Civ.Code Ann. art. 2626 (West 1952). A landowner’s right of ownership is also limited by Civil Code articles 667 and 668, which require that he tolerate some inconvenience from the lawful use of a neighbor’s land. When the neighboring land is owned by the State, those articles are no less applicable. State, through the Department of Transportation and Development v. Chambers Investment Co., Inc., 595 So.2d 598, 604 (La.1992)
*1156 While property may be taken or damaged by the state or its political subdivisions for public purposes in the exercise of police power, just compensation is constitutionally required. According to Chambers, 595 So.2d at 602, the change in La.Const. art I, § 4, which required that the owner in every expropriation shall be compensated for property “taken or damaged ... to the full extent of his loss,” revealed a desire to increase the level and scope of compensation beyond that provided by pre-existing state law.
Furthermore, La.Const. art. I, § 4 and its predecessor article, La.Const. of 1921 art. I, § 2,[4] have been interpreted to support a proceeding by a property owner for a taking or damaging even in the absence of an expropriation action. Despite the legislative failure to provide a procedure to seek redress when property is damaged or taken without the proper exercise of eminent domain, this Court has held that a cause of action must arise out of the self-executing nature of the constitutional command to pay just compensation. Chambers, 595 So.2d at 602; Reymond v. State, Through the Department of Highways, 255 La. 425, 231 So.2d 375, 383 (1970). Such a cause of action is referred to as an inverse condemnation, which is defined in Reymond as the “proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain.” Id.
The liability of a public body in such case, however, has been limited “to those instances where there is a physical taking or damage to property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located.” Reymond, 231 So.2d at 383. In assessing that special damage, it must be determined “whether that damage is not suffered by those in the general neighborhood— that is, whether the damage is peculiar to the individual who complains.” Id. at 384. Therefore, this Court has concluded that damages such as the noise of traffic, a less pleasant view, and a circuitous or more inconvenient route to petitioner’s property, even when these factors resulted in an actual diminution of market value of the property, were not in themselves special damages and were not recoverable. The Reymond Court found that “[djamages which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria [loss without injury in the legal sense].” Id.
Furthermore, it has long been recognized that a public body has the right, under its police power, to divert traffic without subjecting itself to liability. Ramelli v. City of New Orleans, 233 La. 291, 96 So.2d 572, 574 (1957). While recognizing that commercial property owners were inconvenienced by the narrowing of a major traffic artery to construct an overpass and by the diversion of traffic some 3000 feet, the Ramelli Court noted that the inconvenience was common to all property owners within the same vicinity. Accordingly, the Court affirmed the ruling of the trial court that the plaintiffs had sustained a loss without an injury in the legal sense. Similarly, other jurisdictions have concluded that a property owner has no pro-tectable interest in such traffic flow, as opposed to access. William B. Stoebuck, Non-trespassory Takings in Eminent Domain 70 (1977).
Although the Reymond decision predated the 1974 Constitution, there is no indication that the Constitution intended to change the distinctions between expropriation and inverse condemnation, as were discussed in Reymond. Thus, the landowner’s constitutional right to acquire, use and dispose of private property prohibits the state from physically taking or damaging his property without compensation, even for a public purpose. But, in the absence of a taking or physical damage, general damage sustained by property as a consequence of public improvement, such as some degree of ineonve- *1157 nience, must be suffered and endured by owners of separate tracts for the benefit of the general public. In balancing the interests of the owners of private property and the public welfare, the legislature and the judiciary, as well as the framers of the Louisiana Constitution, have reasonably determined that compensation will be limited to owners of property that has been expropriated, except in limited circumstances. However, this Court in State, through the Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598 (La.1992), acknowledged the trend in opinions toward the “increasing acceptance of the possibility of takings without physical invasion” and noted that courts have, at least impliedly, recognized “street access, riparian rights, easements and servitudes, restrictive covenants, and lateral support” as forms of property. Id. at 601-02.
To consider the taking and damaging of legal property rights,[5] which is admittedly abstract and conceptual, the Chambers court adopted a three-prong analysis in determining whether a claimant is entitled to eminent domain compensation. In accordance with this analysis, the court must (1) determine if a right with respect to a thing or an object has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for public purpose under Article I, § 4. Id. at 603. In deciding whether the claimant’s right was taken or damaged, Civil Code articles 667 and 668, which impose legal limitations on a landholder’s right of ownership, must be considered. While Article 667 prohibits the landowner from exercising his right of ownership in such a way as to cause damage to his neighbors, Article 668 requires that he tolerate certain inconveniences which result from the lawful use of a neighbor’s property. Id. at 604. The Chambers court concluded that, where there is no allegation or evidence of personal injury or physical damage to property, a finding of liability under Article 667 “require[s] proof of the presence of some type of excessive or abusive conduct.” Id. at 605.
Conceding for the purposes of this case that street access is a private property right that has been affected and that a public purpose is involved, we do not conclude that there has been a taking in the constitutional sense. There is proof neither of physical damage to property nor excessive or abusive conduct by the DOTD. Trial testimony and exhibits indicate that barricades and road signs, designed to redirect traffic into a one-way system to eliminate the possibility of head-on collisions on the Service Road, caused limited access to this property for a period of time which did not exceed seven months. Although access was undoubtedly restricted by the construction itself, as well as the DOTD’s concerns about public safety, there is no suggestion that Cleary had to be closed, for even a single day, during this seven month period. In fact, plaintiffs’ list of customers, who were inconvenienced by these impediments to access, indicated that access was available, if circuitous. And, there was the testimony of Gerald Constance that engineers from the DOTD both solicited his complaints and remedied them, at least temporarily. Furthermore, the presence of heavy equipment, parked in such manner as to interfere with access, also resulted from actions of the contractors, with whom plaintiffs settled their claims prior to trial. The barricades, the signs, and the parked equipment, which impeded or interfered with access to plaintiffs’ property for a period of *1158 seven months or less, are precisely the types of disturbance, inconvenience, or even financial loss ordinarily occasioned as a general consequence of such a public improvement. While greater accommodation for the adjacent property owners during construction may have been possible, the actions of the DOTD did not rise to the level of excessive or abusive conduct which the State’s neighboring landowners need not tolerate. There was no taking of plaintiffs’ property rights under the Chambers analysis.
Furthermore, we cannot conclude that there was “special damage peculiar to the particular property” as is required to assess liability against a public body under the Reymond holding.[6] The access to and traffic flow by all of the property in the Northeast quadrant of the Clearview Interchange was restricted by the construction and by the permanent re-routing of traffic by this project. While Cleary may have been the only retail business among its immediate neighbors, it cannot be suggested that the damage is peculiar to Cleary. The loss occasioned by the restricted access for each individual property may vary, but the difference is one of degree only. Since the damage was suffered by those in the general neighborhood, it is not compensable.
Accordingly, we reverse the decisions of the District Court and the Court of Appeal, render judgment in favor of the defendant, the State, through the Department of Transportation and Development, Office of Highways, and dismiss plaintiffs’ suit at their cost.
REVERSED AND RENDERED.
ORTIQUE, J., dissents and assigns reasons.
DENNIS, J., concurs with reasons.

 Watson, J., not on the panel. Rule IV, Part 2, § 3.

. Although Gerald Constance testified that the Service Road was cut off right at Clearview, where the DOTD’s contractors were doing the bulldozing construction, and that Sanford Street was barricaded, he does not allege that the business had to be closed for even one day. Furthermore, Russell Doyle, an engineer for the DOTD, asserted that traffic was never completely blocked and that local traffic was permitted to go through the detours on Sanford Street, in accordance with the DOTD's general custom.

. In Dietrich, the DOTD expropriated 43.74 acres of a 365.19 acre tract for construction of Interstate Highway 49. The property owner’s slaughterhouse and cattle-raising operation sustained economic loss. In compliance with the constitutional mandate that the full extent of the loss be compensated when land is expropriated by the state, this Court permitted an award of damages for economic losses.

. The hearing on the motion for a new trial was held before Judge Jo Ellen Grant, who had replaced the original trial judge on the bench.

. La.Const. of 1921 art. I, § 2 provides that "[n]o person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid.”

. With regard to access, a survey of American law indicates that any governmental activity that totally landlocks a parcel is a taking. If the loss of access is less complete, it is suggested that a compensable taking has occurred should there be substantial or unreasonable diminution of access to the road system. Some courts have defined a substantial loss of access as one which renders the land unsuitable for the highest and best use it previously had, and the reasonableness question has turned upon the purpose for which the limitations occurred. A suggested analysis requires that the property right of access be defined as the capacity of an abutting owner to have reasonable ingress and egress and a determination of whether governmental activity has denied it to him. Accordingly, a taking has occurred if a governmental entity diminishes the owner's access to the point where it is no longer reasonable, in which case the owner is entitled to compensation. Stoebuck, supra p. 9, at 24-39.

. According to Reymond, "[t]he liability of a public body for property taken or damaged but not included within its actual expropriation activity must be limited to those instances where there is a physical taking or damage to that property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located."