626 So.2d 1151 (1993)
Carroll LeBlanc, Wife of/and Gerald CONSTANCE and Cleary Bicycle, Moped & Go-Cart Center, Inc.,
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, OFFICE OF HIGHWAYS, Pepper & Associates, Inc., T.L. James and Company, C.A. and Louisiana Paving, Inc.
No. 93-CA-0813.
Supreme Court of Louisiana.
October 28, 1993.
Concurring Opinion November 24, 1993.
Rehearing Denied January 6, 1994.
*1152 Jesse S. Guillot, New Orleans and Ronald J. Bertrand, Rayne, for applicant.
Jerome M. Volk, Jr. and Mark J. Armato, DeMartini, LeBlanc, D'Aquila & Volk, Kenner, for respondent.
Concurring Opinion by Justice Dennis November 24, 1993.
CALOGERO, Chief Justice.[*]
We consider in this inverse condemnation case whether restricted access to property with accompanying reduction in property value and temporary loss of business income triggers the entitlement to compensable damages. Concluding that it does not, we *1153 reverse the decisions of the District Court and the Court of Appeal, which awarded damages and attorney's fees to plaintiffs, 615 So.2d 365 (1993).
In the late 1970's, the Office of Highways of the Department of Transportation and Development for the State of Louisiana ("DOTD") sought to reconstruct the westbound I-10 exit ramp to Clearview Parkway and the adjoining service road network in Jefferson Parish. Studies indicated that traffic on the ramp was expected to increase from 6,580 to 11,300 vehicles per day between 1978 and 1998. The planned improvements were designed to provide greater storage length between the ramp terminal with Clearview Parkway and the Veterans Boulevard intersection as well as a direct connection from Ramp 20 to the Service Road that parallels I-10 on the north side. In seeking the concurrence of the Federal Highway Administration in the project, the state engineer noted that only a narrow strip of right of way adjacent to the northbound roadway of Clearview Parkway between Veterans Boulevard and the Clearview Parkway Interchange would be required. The engineer recommended that, pursuant to the Federal-Aid Highway Program Manual, the 0.38 mile project, which would not require the displacement of any residences or businesses, be classified as a "nonmajor action."
The DOTD entered into a professional service agreement with Pepper & Associates, Inc. to assist in the preparation of construction drawings and specifications for modifications to the I-10/Clearview Interchange. To perform the construction phase of the project, the DOTD contracted with T.L. James & Co., Inc. and Louisiana Paving Company, Inc. On August 17, 1981, the work order was issued, but construction of the project did not begin until September 1, 1981. Pursuant to the Notice of Final Acceptance recorded in the mortgage records of Jefferson Parish, the project was completed by the contractor and accepted by the DOTD on March 23, 1982, less than seven months after commencement of the work.
Before the project, property near the intersection of Clearview and the Service Road could be reached by four primary approaches, as follows:
1. from the north on Clearview Parkway. A southbound vehicle could turn left, cross Clearview northbound traffic just south of Veterans Boulevard onto the Service Road.
2. from the east on I-10. A vehicle traveling from New Orleans and Metairie would exit the northbound ramp onto Clearview Parkway, proceed north briefly, and turn right onto the Service Road.
3. from the south on Clearview Parkway. A northbound vehicle could turn right onto the Service Road.
4. from the west on I-10. A vehicle traveling from Kenner and LaPlace would take the Clearview-North exit, proceed north on Clearview, and turn right onto the Service Road.
After the redesign of the exit ramp, the approaches to the northeast quadrant of the Clearview Interchange were modified in part, so that just two of the above described approaches were not adversely affected. Although approaches 1 and 2, described above, either remain unchanged or even enhance access to the northeast quadrant, approaches 3 and 4 now require a more circuitous route after the completion of construction. From the south on Clearview Parkway or from the west on I-10 (turning north onto Clearview), a vehicle is prohibited from making a right turn from Clearview onto the Service Road. To reach the northeast quadrant from these approaches then, a driver may either (a) drive north on Clearview to Veterans, turn right on Veterans, turn right into the shopping center, travel through the shopping center parking lot to Sanford Street, and travel up Sanford to the Service Road; (b) drive north on Clearview to Veterans, turn right on Veterans, turn right on Kingman Street, turn right on Trenton Street, turn right on Woodlawn Avenue, and turn right on Sanford to the Service Road; or (c) drive north on Clearview past Veterans, make a "U" turn, and proceed south to the left-turn lane onto the Service Road.
Plaintiffs, Carroll LeBlanc, wife of/and Gerald Constance ("Constance"), own the land and improvements bearing the municipal address 3001 Clearview Parkway, Metairie, *1154 but actually located at the corner of the I-10 Service Road and Sanford Street, within the northeast quadrant of the Clearview Interchange and adjacent to the project. The property, which they lease to the corporate plaintiff, Cleary Bicycle, Moped & Go-Cart Center, Inc. ("Cleary"), was acquired on March 24, 1978 for a purchase price of $50,000.00. Simultaneously, Constance executed a collateral mortgage in the amount of $150,000.00 to secure capital for construction costs. The building was complete by September 1, 1978, when Cleary, a business engaged in the sale and service of bicycles and accessories, both juvenile products and bikes in the $150 to $1,000 range for an up-scale, middle to upper income market, opened at this location.
According to Gerald Constance, who testified as the president of Cleary and as the owner/lessor of the property, the seven months of construction and the permanent re-routing of traffic has resulted in substantial loss of sales to the business as well as a permanent devaluation of his property. During construction, the location of barricades and re-routing signs limited access to his property, which is located across Sanford Street from a biochemical laboratory and near a radio station. Furthermore, photographs introduced as evidence at the trial reflected the storage of road building and earth moving equipment between the Clearview entrance to the Service Road and the business. As evidence of the effects of construction on the business, a six page list of customers, who experienced difficulty in reaching the bicycle shop during the period of construction, together with the deposition of one of these customers, were offered by plaintiffs. Gerald Constance admitted, however, that, at the beginning of the project, a group of engineers from the Highway Department actually solicited his complaints and took action with regard to both the signing and the barricades.[1] Notwithstanding this effort by the DOTD's agents to relieve the situation, both the signs and the barricades consistently reappeared. Furthermore, plaintiffs contend that, even after the construction phase, the substantial alteration to the traffic patterns in their quadrant of the Clearview Interchange have limited access to their property despite its high visibility from the major connecting artery.
In addition to the testimony of Gerald Constance, the corporation's financial information for the taxable years ending 7/31/80 through 7/31/88 was introduced with analysis by Cleary's accountant employed since 1986 and by a CPA retained by the DOTD to review the information. Although the relevance of figures is contested in terms of the profit and loss analysis, it is undisputed that gross sales during the year of construction (the taxable year ending 7/31/82) of $186,683 were lower than both the immediately preceding year ($223,207) and the immediately following year ($241,055). On the other hand, it is undisputed that Constance received increased income each year during the relevant period, from the taxable year before to the taxable year following construction, August 1, 1980July 31, 1983, from salary as president of Cleary ($19,000 to $24,600 to $26,000) and from the rent he received as owner of the property leased to Cleary ($24,000 to $34,300 to $33,400).
Appraisers for Constance and the DOTD also testified concerning the alleged devaluation of the property itself. Both agreed that the highest and best use of the property had not changed. According to the plaintiffs' expert, the property retained its commercial attributes because of its proximity to the shopping center and high visibility "even though it's a little harder to get to." Nevertheless, he maintained that the rental value of the property has been reduced since the income stream is probably affected by the reconstruction of the Interchange and the Service Road. Therefore, relying primarily on the estimated rental differential the property would likely command after the construction *1155 of the project, plaintiffs' appraiser concluded that the loss to the property's value as a result of the changed access was $55,000. Using comparables from sales, the DOTD's expert testified that the improvements, which retained their highest and best use, would have suffered no diminution in value. He agreed, however that the land had been diminished in value, but by only $17,710.
Alleging both the loss of sales and the devaluation of the property, Constance and Cleary filed suit in the 24th Judicial District Court for the Parish of Jefferson on August 2, 1982 against the DOTD as well as those directly involved in the design and construction of the project. T.L. James & Co., Inc. and Louisiana Paving Co., Inc. settled all claims brought by plaintiffs and were dismissed from the lawsuit by order of the court dated December 26, 1989. In a judgment rendered with reasons on December 19, 1991, the trial court found that the plaintiffs proved by a preponderance of the evidence that they suffered both a devaluation of their property value and a loss of sales. Relying on State, Department of Transportation and Development v. Dietrich, 555 So.2d 1355 (La. 1990), an expropriation proceeding rather than a case of inverse condemnation,[2] the trial court concluded that, since economic losses had been suffered by a business, damages must be awarded to fully compensate the owner. Accordingly, the court rendered judgment in favor of Constance and against the DOTD in the sum of $55,000, plus attorney's fees of $10,000, and in favor of Cleary and against the DOTD in the sum of $53,153, plus attorney's fees of $10,000. Defendant's motion for a new trial was denied on February 20, 1992.[3]
The Court of Appeal affirmed the judgment of the trial court in all respects. That court found that the damages suffered by the plaintiff in this case, which were caused by the restriction of access to their property, exceeded the level of ordinary inconvenience and are peculiar to plaintiffs, since Cleary was the only retail business in the area to be affected by the construction. Relying on Dietrich as well as State, Department of Transportation and Development v. Pace, 588 So.2d 145 (La.App. 4th Cir.1991) (another expropriation case), Harrington v. Southwestern Electric Power, 567 So.2d 731 (La. App. 2d Cir.1990), (reversed exceptions of no cause of action and no right of action since plaintiff's petition could reasonably be interpreted as claiming that the impairment of access was peculiar to his property) and Bowden v. State, Department of Transportation and Development, 556 So.2d 1343 (La. App. 3d Cir.1990) (involved a complete, permanent loss of access as a result of highway construction), the Court of Appeal concluded that these damages are compensable. The Court of Appeal also agreed with the trial judge that attorney's fees are authorized in an action based on inverse condemnation pursuant to La.Rev.Stat.Ann. § 13:5111(A) (West 1991).
Although our state constitution recognizes that every person has the right to acquire, use and dispose of private property, this right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. La.Const. art. I, § 4 (1989). In fact, general interest takes precedence over that of individuals, and any individual must yield any particular property to the community, should it become necessary for the general use. La.Civ.Code Ann. art. 2626 (West 1952). A landowner's right of ownership is also limited by Civil Code articles 667 and 668, which require that he tolerate some inconvenience from the lawful use of a neighbor's land. When the neighboring land is owned by the State, those articles are no less applicable. State, through the Department of Transportation and Development v. Chambers Investment Co., Inc., 595 So.2d 598, 604 (La.1992)
*1156 While property may be taken or damaged by the state or its political subdivisions for public purposes in the exercise of police power, just compensation is constitutionally required. According to Chambers, 595 So.2d at 602, the change in La.Const. art I, § 4, which required that the owner in every expropriation shall be compensated for property "taken or damaged ... to the full extent of his loss," revealed a desire to increase the level and scope of compensation beyond that provided by pre-existing state law.
Furthermore, La.Const. art. I, § 4 and its predecessor article, La.Const. of 1921 art. I, § 2,[4] have been interpreted to support a proceeding by a property owner for a taking or damaging even in the absence of an expropriation action. Despite the legislative failure to provide a procedure to seek redress when property is damaged or taken without the proper exercise of eminent domain, this Court has held that a cause of action must arise out of the self-executing nature of the constitutional command to pay just compensation. Chambers, 595 So.2d at 602; Reymond v. State, Through the Department of Highways, 255 La. 425, 231 So.2d 375, 383 (1970). Such a cause of action is referred to as an inverse condemnation, which is defined in Reymond as the "proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain." Id.
The liability of a public body in such case, however, has been limited "to those instances where there is a physical taking or damage to property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located." Reymond, 231 So.2d at 383. In assessing that special damage, it must be determined "whether that damage is not suffered by those in the general neighborhood that is, whether the damage is peculiar to the individual who complains." Id. at 384. Therefore, this Court has concluded that damages such as the noise of traffic, a less pleasant view, and a circuitous or more inconvenient route to petitioner's property, even when these factors resulted in an actual diminution of market value of the property, were not in themselves special damages and were not recoverable. The Reymond Court found that "[d]amages which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria [loss without injury in the legal sense]." Id.
Furthermore, it has long been recognized that a public body has the right, under its police power, to divert traffic without subjecting itself to liability. Ramelli v. City of New Orleans, 233 La. 291, 96 So.2d 572, 574 (1957). While recognizing that commercial property owners were inconvenienced by the narrowing of a major traffic artery to construct an overpass and by the diversion of traffic some 3000 feet, the Ramelli Court noted that the inconvenience was common to all property owners within the same vicinity. Accordingly, the Court affirmed the ruling of the trial court that the plaintiffs had sustained a loss without an injury in the legal sense. Similarly, other jurisdictions have concluded that a property owner has no protectable interest in such traffic flow, as opposed to access. William B. Stoebuck, Nontrespassory Takings in Eminent Domain 70 (1977).
Although the Reymond decision pre-dated the 1974 Constitution, there is no indication that the Constitution intended to change the distinctions between expropriation and inverse condemnation, as were discussed in Reymond. Thus, the landowner's constitutional right to acquire, use and dispose of private property prohibits the state from physically taking or damaging his property without compensation, even for a public purpose. But, in the absence of a taking or physical damage, general damage sustained by property as a consequence of public improvement, such as some degree of inconvenience, *1157 must be suffered and endured by owners of separate tracts for the benefit of the general public. In balancing the interests of the owners of private property and the public welfare, the legislature and the judiciary, as well as the framers of the Louisiana Constitution, have reasonably determined that compensation will be limited to owners of property that has been expropriated, except in limited circumstances. However, this Court in State, through the Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598 (La.1992), acknowledged the trend in opinions toward the "increasing acceptance of the possibility of takings without physical invasion" and noted that courts have, at least impliedly, recognized "street access, riparian rights, easements and servitudes, restrictive covenants, and lateral support" as forms of property. Id. at 601-02.
To consider the taking and damaging of legal property rights,[5] which is admittedly abstract and conceptual, the Chambers court adopted a three-prong analysis in determining whether a claimant is entitled to eminent domain compensation. In accordance with this analysis, the court must (1) determine if a right with respect to a thing or an object has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for public purpose under Article I, § 4. Id. at 603. In deciding whether the claimant's right was taken or damaged, Civil Code articles 667 and 668, which impose legal limitations on a landholder's right of ownership, must be considered. While Article 667 prohibits the landowner from exercising his right of ownership in such a way as to cause damage to his neighbors, Article 668 requires that he tolerate certain inconveniences which result from the lawful use of a neighbor's property. Id. at 604. The Chambers court concluded that, where there is no allegation or evidence of personal injury or physical damage to property, a finding of liability under Article 667 "require[s] proof of the presence of some type of excessive or abusive conduct." Id. at 605.
Conceding for the purposes of this case that street access is a private property right that has been affected and that a public purpose is involved, we do not conclude that there has been a taking in the constitutional sense. There is proof neither of physical damage to property nor excessive or abusive conduct by the DOTD. Trial testimony and exhibits indicate that barricades and road signs, designed to redirect traffic into a one-way system to eliminate the possibility of head-on collisions on the Service Road, caused limited access to this property for a period of time which did not exceed seven months. Although access was undoubtedly restricted by the construction itself, as well as the DOTD's concerns about public safety, there is no suggestion that Cleary had to be closed, for even a single day, during this seven month period. In fact, plaintiffs' list of customers, who were inconvenienced by these impediments to access, indicated that access was available, if circuitous. And, there was the testimony of Gerald Constance that engineers from the DOTD both solicited his complaints and remedied them, at least temporarily. Furthermore, the presence of heavy equipment, parked in such manner as to interfere with access, also resulted from actions of the contractors, with whom plaintiffs settled their claims prior to trial. The barricades, the signs, and the parked equipment, which impeded or interfered with access to plaintiffs' property for a period of *1158 seven months or less, are precisely the types of disturbance, inconvenience, or even financial loss ordinarily occasioned as a general consequence of such a public improvement. While greater accommodation for the adjacent property owners during construction may have been possible, the actions of the DOTD did not rise to the level of excessive or abusive conduct which the State's neighboring landowners need not tolerate. There was no taking of plaintiffs' property rights under the Chambers analysis.
Furthermore, we cannot conclude that there was "special damage peculiar to the particular property" as is required to assess liability against a public body under the Reymond holding.[6] The access to and traffic flow by all of the property in the Northeast quadrant of the Clearview Interchange was restricted by the construction and by the permanent re-routing of traffic by this project. While Cleary may have been the only retail business among its immediate neighbors, it cannot be suggested that the damage is peculiar to Cleary. The loss occasioned by the restricted access for each individual property may vary, but the difference is one of degree only. Since the damage was suffered by those in the general neighborhood, it is not compensable.
Accordingly, we reverse the decisions of the District Court and the Court of Appeal, render judgment in favor of the defendant, the State, through the Department of Transportation and Development, Office of Highways, and dismiss plaintiffs' suit at their cost.
REVERSED AND RENDERED.
ORTIQUE, J., dissents and assigns reasons.
DENNIS, J., concurs with reasons.
ORTIQUE, Justice, dissenting.
The majority opinion finds without exception that in inverse condemnation cases involving restricted access to property with accompanying reduction in property value and temporary loss of business income, a property owner's entitlement to compensable damages is not triggered. I believe that the scope of the majority's pronouncement is overly broad in view of the facts of this case as well as the jurisprudence. The trial court and the court of appeal found, based upon all the evidence, that plaintiffs were entitled to compensation.
The majority opinion reveals that the expert who testified on behalf of the State admitted that plaintiffs' land had been diminished in value in the approximate amount of $17,710. Maj. op. at 1155. Yet, the majority finds that plaintiffs' are not entitled to any compensation. The jurisprudence relied upon by the majority involve circumstances in which there was little or no evidence of monetary loss or property devaluation or other special damage peculiar to the particular property. State, Through the Department of Transportation and Development, 595 So.2d 598 (La.1992) (plaintiff sought recovery based upon inability to develop land as planned due to construction.); Reymond v. State, Through the Department of Highways, 231 So.2d 375 (La.1970) (damage suffered by plaintiff not compensable because damage was general and suffered by other property owners similarly located); Ramelli v. City of New Orleans, 233 La. 291, 96 So.2d 572 (1957) (no recovery because the inconvenience was common to all property owners within the same vicinity).
The majority is silent as to the results of its review of the record with respect to evidence tending to prove that other property owners in the area suffered similar losses or that the construction had a similar effect upon their property, yet the majority concludes that plaintiffs' damage is not compensable on the basis of its commonality with the damage suffered by all other property owners in the area. The record reflects that plaintiffs' owned the only retail establishment in the immediate area of the construction. The majority cites Reymond v. State, Through the Department of Highways, supra, for the proposition that compensation is *1159 not payable unless there is special rather than general damage. Because of plaintiffs' status as the only retail establishment, clearly any damage sustained by their business would be distinguishable from damage sustained by non-retail establishments that do not depend upon the ingress and egress of the general public for their livelihood.
The majority reverses the judgment of the trial court and the court of appeal without application of the appropriate standard of review. The findings of a lower court should not be disturbed on appeal, unless after a thorough review of the record, an appellate court finds that lower courts were clearly wrong or committed manifest error in reaching a decision. Rosell v. ESCO, 549 So.2d 840 (La.1989). The majority fails to establish that the lower courts committed manifest error or were clearly wrong in rendering judgment for plaintiffs.
For the reasons assigned, I respectfully dissent.
DENNIS, Justice (concurring).

[November 24, 1993]
I respectfully concur.
Because the taking and damaging of legal property rights, as opposed to the concrete objects of those rights, is by nature abstract and conceptual and often incompletely understood, there is an uncommon need for a firm framework of analysis. Accordingly, in State through DOTD v. Chambers Investment Co. Inc., 595 So.2d 598 (La.1992), this court adopted a three-pronged test for determining whether a claimant is entitled to eminent domain compensation: First, has a person's legal right with respect to a thing been affected? In other words, does he have a recognized species of private property right that has been affected, regardless of whether causes of action may exist on other theories? Second, if so, has this particular property, either a right or a thing, been taken or damaged, in a constitutional sense? Third, and if so, was the taking or damage done for a public purpose under Article I, § 4 of our state constitution? See A. Yiannopoulos, Property, 2 La.Civil Law Treatise § 1 (3rd ed. 1991); W. Stoebuck, Nontrespassory Takings in Eminent Domain, 19-20 (1977).
Initially, the claimants' interest that they contend was adversely affectedaccess to their commercial establishmentclearly constitutes property within the purview of our eminent domain law. The interest of a property owner in the accessibility of his land by motor vehicular traffic is a property right which cannot be damaged or taken without due process and just compensation. E.g., State ex rel Gebelin v. Department of Highways, 200 La. 409, 8 So.2d 71 (1942); M. Dakin and M. Klein, Eminent Domain in Louisiana, 117-18 (1970). Therefore, it is necessary to proceed to the next prong of the three-pronged test and determine whether this property interest was taken or damaged in the constitutional sense.
It is important to bear in mind that the claimants suffered at most a partial rather than a total loss of access. The rule with respect to a total loss of access is now clear. Whatever may have been the prevailing view in the previous century, today there is no doubt that governmental action completely extinguishing a land owner's access to the street or highway system amounts to a taking or damage to property, regardless of whether part of the owner's physical land is actually taken. State ex rel Gebelin v. Department of Highways, supra; Dakin, supra; Stoebuck, supra at 28-34.
It is much less clear, however, what rule should be applied in cases of partial loss of access. In this area, the changing concepts of "taking" and "property", and "police-power" versus "eminent-domain" have resulted in "a jumble of doctrines, lack of uniformity of decisions, and ... dissimilar treatment of landowners who have suffered similar kinds of harm." Stoebuck, supra at 34-35. Nevertheless, there has been increasing judicial reliance on a line of analysis that serves to coherently reconcile most of the recent cases. Under that analysis, the owner of land enjoying access to a public way is recognized as having a property right to have reasonable access to that roadway or to the general system of public roads by means of locomotion that are normal for land situated as his is. Therefore, a taking or damage in the eminent domain sense occurs if some action *1160 by an entity having the power of eminent domain diminishes such access to the point that it is no longer "reasonable". Stoebuck, supra at 70 and 34-71, as well as authorities cited therein; see also cases discussed by Dakin, supra at 121-27 and pocket part at 46-48.
The foregoing analysis rests on Justice Holmes observation that:
Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation, and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts.

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).
Applying these precepts to the present case, it appears that the claimants have failed to prove that their property interest was damaged or taken in the constitutional sense. Although the claimants to some extent suffered a loss of direct access to their property, they by no means have been denied reasonable access to most of the ways previously serving the property or to the road system in general. Prior to construction, there were numerous methods of access: (1) from the south-bound lane of Clearview by left turn across the opposite lane to the frontage road leading to the shop; (2) from the north-bound lane of Clearview by right turn onto the frontage road to the property; (3) from I-10, either east-bound or west-bound, off-ramp to north Clearview and then right turn onto frontage road to the shop; and (4) two other more circuitous routes: north on Clearview, right on Veterans, through the shopping center parking lot to Sanford Street, to the shop or north on Clearview, right on Veterans, right on Kingman, right on Trenton, right on Woodlawn, right on Sanford to the shop. After the redesign and construction of the Clearview/I-10 interchange the property now may be accessed: (1) from south-bound lane of Clearview by left turn across opposite lane to frontage road, the same as before construction; (2) from north-bound lane of Clearview a right turn onto the frontage road is now prohibited, motorists must proceed by a slightly more circuitous route by continuing north on Clearview across Veterans for about one block, making a "U" turn and then proceeding south to the left-turn lane onto the frontage road to the shop; (3) the access from I-10 east-bound takes the Clearview-North exit and proceeds north on Clearview the same as northbound Clearview trafficthis route is also somewhat more circuitous than before construction; (4) traffic from I-10 west-bound now takes the redesigned exit ramp onto the frontage road and then swings around the triangular block at Trenton and Woodlawn and then back up the frontage road to the bicycle shop; (5) after construction access No. 4 described above, remains exactly as before construction. Clearly, some of the access options have been limited somewhat but not nearly enough that the access to the road system is no longer reasonable. As for the temporary interference with access claim, as the facts alluded to in the majority opinion indicate, there was no taking or damage in the constitutional sense because, considering both the physical and temporal extent of the interference, the loss suffered was not substantial.
Finally, because the claimants failed to prove a taking or damage to their property interest, it is not necessary to consider the final prong of the three-pronged test, viz., whether the taking or damage was for a public purpose. Furthermore, it is not necessary to consider two irrelevant questions discussed by the court of appeal and the majority of this court, viz., whether there was special damage peculiar to claimants' property and whether the state made work on its estate causing actionable inconvenience to the claimants under Civil Code articles 667-669. The claimants were not required to show that they sustained special or peculiar *1161 damage; their proof of any damage or taking in the constitutional sense would have sufficed. However, they were unable to prove the only type of constitutional damage seriously contended for, temporary and permanent partial losses of access to their property beyond the magnitude permissible under the police power. Consequently, except for the three-pronged analysis, the discussion of Chambers is unnecessary; and Reymond v. State, Dept. of Highways, 255 La. 425, 231 So.2d 375 (1970) is inapposite and mostly obsolete.
NOTES
[*] Watson, J., not on the panel. Rule IV, Part 2, § 3.
[1] Although Gerald Constance testified that the Service Road was cut off right at Clearview, where the DOTD's contractors were doing the bulldozing construction, and that Sanford Street was barricaded, he does not allege that the business had to be closed for even one day. Furthermore, Russell Doyle, an engineer for the DOTD, asserted that traffic was never completely blocked and that local traffic was permitted to go through the detours on Sanford Street, in accordance with the DOTD's general custom.
[2] In Dietrich, the DOTD expropriated 43.74 acres of a 365.19 acre tract for construction of Interstate Highway 49. The property owner's slaughterhouse and cattle-raising operation sustained economic loss. In compliance with the constitutional mandate that the full extent of the loss be compensated when land is expropriated by the state, this Court permitted an award of damages for economic losses.
[3] The hearing on the motion for a new trial was held before Judge Jo Ellen Grant, who had replaced the original trial judge on the bench.
[4] La.Const. of 1921 art. I, § 2 provides that "[n]o person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
[5] With regard to access, a survey of American law indicates that any governmental activity that totally landlocks a parcel is a taking. If the loss of access is less complete, it is suggested that a compensable taking has occurred should there be substantial or unreasonable diminution of access to the road system. Some courts have defined a substantial loss of access as one which renders the land unsuitable for the highest and best use it previously had, and the reasonableness question has turned upon the purpose for which the limitations occurred. A suggested analysis requires that the property right of access be defined as the capacity of an abutting owner to have reasonable ingress and egress and a determination of whether governmental activity has denied it to him. Accordingly, a taking has occurred if a governmental entity diminishes the owner's access to the point where it is no longer reasonable, in which case the owner is entitled to compensation. Stoebuck, supra p. 9, at 24-39.
[6] According to Reymond, "[t]he liability of a public body for property taken or damaged but not included within its actual expropriation activity must be limited to those instances where there is a physical taking or damage to that property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located."