817 So.2d 324 (2002)
In the Matter of MEMBERS OF A CLASS OF DESCENDANTS OF THE FORMER OWNERS OF CHENIERE RONQUILLO.
In the Matter of Members of a Class of Descendants of the Former Owners of Cheniere Ronquillo, Deanna Angelo, Individually and as Representative of the Former Owners of Cheniere Ronquillo,
v.
State of Louisiana, Plaquemines Parish Government, Plaquemines Parish School Board, the Louisiana Land and Exploration Company, a Maryland Corporation Registered and Doing Business in the State of Louisiana, Zeno, Inc., a Louisiana Corporation, et al.
In the Matter of Members of a Class of Descendants of the Former Owners of Cheniere Ronquillo, Deanna Angelo, Individually and as Representative of the Former Owners of Cheniere Ronquillo,
v.
State of Louisiana, Plaquemines Parish Government, and Plaquemines Parish School Board.
Estelle Hingle Cosse', Barbara Hingle Walsh, Mildred Hingle Morris and Isabelle Hingle Zebrick, on Behalf of Themselves and all Others Similarly Situated,
v.
State of Louisiana, Plaquemines Parish Government, and the Plaquemines Parish School Board.
Donald G. Majeste, Richard M. Majeste, Edward J. Majeste IV, Brian S. Majeste and Cary Dudenhefer,
v.
The State of Louisiana, Plaquemines Parish Government and the Plaquemines Parish School Board.
Roy Fontenelle and Scuddy Fontenelle,
v.
State of Louisiana, Plaquemines Parish Government, Plaquemines Parish School Board, and XYZ, Defendants.
Johnny A. and Renee Staley, Lorenzo W. Staley, Sr., Billy W. Young, Jr., and Benjamin S. Young,
v.
State of Louisiana, Plaquemines Parish Government, Plaquemines Parish School Board and ABC and XYZ, Defendants.
William Riser, Claudette Riser O'Neill, and Patricia Riser Jones, Individually and as Descendants of the Original Owners of Cheniere Ronquillo,
v.
State of Louisiana, Plaquemines Parish Government, Plaquemines Parish School Board, Louisiana Department of Natural Resources, and ABC And XYZ, Defendants.
Damian Joseph Ortolano, Licia Ann Ortolano Duffy, Norris Joseph Ortolano, Kermit Joseph Ortolano, Anna Maria Ortolano Manis, Kea Maria Ortolano Sullivan, Gina Marie Ortolano Stephens, Annette Maria Ortolano Eccles, Yvette Marie Ortolano Burrows, et al.,
v.
State of Louisiana, Plaquemines Parish Government and the Plaquemines Parish School Board.
Nos. 2001-CA-1548 to 2001-CA-1556.
Court of Appeal of Louisiana, Fourth Circuit.
April 24, 2002.
John D. Rawls, New Orleans, LA, Cesar J. Vazquez, Kenner, LA, for Appellant, Deanma Angelo and the Class she Represents.
Conrad S.P. Williams, III, St. Martin & Williams, Houma, LA, for Appellants, The Ronquillo Heirs.
Robert E. Arceneaux, Metairie, LA, for Appellee, Plaquemines Parish School Board.
Richard P. Ieyoub, Attorney General, Robert H. Carpenter, Jr., Assistant Attorney General, Baton Rouge, LA, for Appellee, State of Louisiana.
Michael L. Mullin, Assistant Parish Attorney, Plaquemines Parish Government, Belle Chasse, LA, for Appellee, Plaquemines Parish Government.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JAMES F. McKAY III and Judge DAVID S. GORBATY).
*326 WILLIAM H. BYRNES III, Chief Judge.
This is a class action involving a claim to a tract of land known as the "Cheniere Ronquillo" located in Plaquemines Parish, Louisiana. Both subclasses allege that they have a superior claim to land claimed by the State of Louisiana or transferred by the State to one or more of its agencies. The district court recognized two subclasses: (1) The "Ronquillo Heirs" who claim an unbroken chain of title from their ancestors, the original owners of the land, and (2) the "Ronquillo Vendees" who claim that their ancestors in title purchased all rights in the land from the original owners of the land and were the owners of the land at the time of the taking.
The original salvo in this protracted litigation was a Class Action Petition for Declaratory Judgment filed on January 11, 1988, alleging that Louisiana's claim to the contested lands derives from the Swamp Land Act of 1849, and that the "United States Government confirmed to the State of Louisiana the title to subject lands by Act of Congress dated March 3, 1857." This petition asked the court to declare, among other things, that this confirmation of title to the State of Louisiana by the United States and subsequent transfer by the State to the Buras Basin Levee District was an expropriation. The petition failed to name any parties defendant and no one was served. On August 29, 1988, the trial court entered a judgment to that effect declaring that the State had acquired its title by means of expropriation. This judgment was annulled in collateral proceedings wherein the court of appeal noted that the judgment had been rendered pursuant to what it described as "a highly unusual ex parte hearing." Angelo v. Ales, 94-0320 (La.App. 1 Cir. 12/22/94), 649 So.2d 1042, 1044.
By second supplemental and amended petition, the State of Louisiana, the Plaquemines Parish Government, in its own capacity and as successor to the Buras Basin Levee District, and the Plaquemines Parish School Board, in its own capacity and as successor at law to the Buras Basin Levee District, were all named as defendants, the original petition having failed to name any defendants.
A trial on the merits was held on July 24, 2000, consisting of the introduction of countless exhibits by plaintiffs and defendants and the live testimony of Dorothy Chevalier and William D. Reeves, PhD.
Ms. Chevalier, the Chief Deputy Clerk of Court for the Parish of Plaquemines Parish testified as to the authenticity of certain documents and to the fact that certain original documents were missing.
William D. Reeves, PhD., a contract historian, was qualified as an expert on the history of Southeast Louisiana, an expert translator of French documents, and an expert experienced in running Louisiana chains of title, particularly those requiring transcription of ancient handwritten documents and translation of French. But the court made it clear that it did not accept Dr. Reeves as an expert qualified to establish legal title. Dr. Reeves testified concerning his research on the plaintiffs' chain of title.
Following this trial on the merits, the trial court essentially sustained exceptions of no right or cause of action based on a finding that the plaintiffs would have no claim unless the land had been acquired by the State of Louisiana and/or its political subdivisions and agencies by expropriation or under threat of expropriation; and that the record proved conclusively that the acquisition of the land by the State of Louisiana and its agency successors in title was not effected by means of expropriation *327 or under threat of expropriation as a matter of law.
None of the plaintiffs assign as error the use by the trial court for deciding the case of the procedural vehicle of the exceptions of no cause or right of action. The second assignment of error found in the original brief of Deanna Angelo and the Ronquillo Vendees complains of the granting of the exceptions, but does so because it disputes the finding that the taking was not an expropriation, not because of any impropriety in the unorthodox employment of such exceptions in connection with a trial on the merits. The brief of the Ronquillo Heirs also did not assign as error the use of the exceptions of no right or cause of action as the procedural vehicle for dismissing their claims. All parties seem to agree, as does this Court, that the pivotal issue in this case is whether the State's claim to the disputed lands deriving from the Swamp Land Act of 1849 can be characterized as an expropriation. The procedural label attached to this determination will make no material difference in the result reached by this Court based on the record before us.
It is undisputed that the defendants' claims to all of the land in question originates in the State's title arising out of the Swamp Land Act of 1849, with the exception of Section 16 of Township 21 South, Range 26, East.
La. Const. Art. 7, sec. 14 provides that "the funds, credit, property, or things of value of the state or any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private." We may reasonably infer that the purpose of this Constitutional provision is to protect the electorate from the possibility that a politically powerful individual or interest could importune the legislature or other governmental entity into making a donation of assets of the State. However, Subsection "B" of said Art. 7, sec. 14 provides, in pertinent part, the following limited exception:
Nothing in this Section shall prevent... (4) the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation, when the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased to exist and orders the return of the property to the former owner under such terms and conditions as specified by the legislature; [Emphasis added.]
Under the highlighted provisions quoted above from La. Const. Art. VII, Sec. 14B, the state may return lands to private ownership only where the land was acquired by expropriation or under the threat of expropriation.
Plaintiffs base their claim on Act 245 of 1985, Act 931 of 1997, and Act 131 of 1998. At all times it must be remembered that to the extent that the plaintiffs may claim rights under these acts that conflict with the above quoted constitutional provision, the constitutional provision prevails.
Act 245 of 1985, Section 1 provides in pertinent part:
Pursuant to authority of Louisiana Constitution Article VII, Section 14(B), the Legislature of Louisiana hereby declares that if the selection of certain swamp lands, more specifically Sections 9, 10, 11, 12, 14, 15, and 16 of Township 21 south, Range 26 East, Plaquemines Parish, pursuant to the Swamp-Lands Act of March 2, 1849, 9 Stat. 352, and the subsequent transfer of said properties to the Board of Levee *328 Commissioners of the Buras Levee District on May 14, 1895, May 10, 1928, and October 9, 1928 is declared or constituted, in a final judgment in a court of competent jurisdiction, as having been an expropriation or purchase under the threat of expropriation, and if a court of competent jurisdiction declares in a final judgment that the ownership of such property vested in persons and or entities other than the United States government, the state of Louisiana, or their political subdivisions prior to 1850, then the public and necessary purpose which may have supported any such expropriation has ceased to exist only insofar as it may have affected the ownership of any private property or any private mineral rights to the above described swamp lands. The Legislature of Louisiana, subject thereto, orders the Board of Levee Commissioners of the Buras Levee District (herein referred to as "Board"), to return the ownership of said property to the former private owners of record or their successors from whom any such property was acquired by expropriation. [Emphasis added.]
The references in Act 245 of 1985 to "expropriation or purchase under threat of expropriation" and to La. Const. Art. VII, Section 14B, demonstrate the awareness of the Legislature of the constitutional limitations on the Legislature's ability to return property to private owners.
Act 931 of 1997 provided that the "public and necessary purpose which may have originally supported the selection of certain swamp lands ... pursuant to the Swamp-Lands Act ... is called into question as to the manner and procedure used in the acquisition of said property." The presumptive heirs of the original owners were authorized to assert their rights of ownership within one year from the date of this Act.
Act 131 of 1998 amended and reenacted Section 1 of Act 931 of 1997, and "authorizes the presumptive heirs of Don Juan Ronquillo and/or Graciana Solis, the original owners of said properties, one year from the effective date of this Act in which to assert their rights or ownership to said property, including all mineral rights." This description fits that of the sub-class known as the "Ronquillo Heirs."
Act 931 of 1997 and Act 131 of 1998 referred to Sections 9, 10, 15, and 16 of Township 21 South, Range 26 East, only, omitting reference to Sections 11, 12 and 14 which were included in act 245 of 1985. None of these acts makes any provision for the recovery of monetary damages by the classes of claimants described therein.
The trial court described the aforementioned acts of the legislature as follows:
This rather zealous attempt by the legislature to voice its displeasure as to the public need for the property claimed by these Plaintiffs directs itself to the provision of the Constitution added in 1983. Article 7, Section 14 of the Louisiana Constitution of 1974 prohibits the donation of any of the property of the state or of any political subdivision to any person.
By expressing itself in this manner, we infer that the trial court felt that the attempt by the plaintiffs in the instant case to claim the lands in question resulted in just the type of action by the legislature that the Constitutional provision was designed to prevent. There are certain aspects of this case, including a previous thwarted attempt to rush to judgment found in Angelo v. Ales, 94-0320 (La.App. 1 Cir. 12/22/94), 649 So.2d 1042, that support this inference.
*329 Trial on the merits was held on July 24, 2000 and on February 14, 2001, the district court sustained the defendants' exceptions of no right or cause of action, finding that the land in question was never expropriated or taken under threat of expropriation:
The property involved in this litigation was not expropriated by the State or any political subdivision of the state, nor purchased under threat of expropriation. The property was "selected" and transferred to the State of Louisiana as public lands belonging to the federal government....
The title to this land has been in the name of the State of Louisiana, Buras Levee District and Plaquemines Parish School Board collectively for more than 150 years. For the property to be returned to the property owners pursuant to the authority of the legislative act upon which this suit is based, and the exception to Article 7, Section 14, subsection (B), upon which it relies, requires specific facts to be proven. Such proof has not been forthcoming. This property was not expropriated or purchased under threat of expropriation and the exception does not apply.
Board of Com'rs of Orleans Levee Dist. v. Gomez, 621 So.2d 826, 833-834 (La.App. 1 Cir.1992)[1], draws a clear distinction between the State's power to return expropriated property no longer required for public use and the lack of State's lack of power to return land not acquired by expropriation:
Generally, constitutional prohibition must be interpreted stricti juris, and anything not literally prohibited thereby would be permitted. Under the clear wording of these constitutional provisions, the state or its political subdivisions are prohibited from donating state property. However, the constitution permits the state to donate its property if certain requirements have been met. First, the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased to exist and orders the return of the property. Second, the property, including mineral rights, must have previously been expropriated or purchased under threat of expropriation.
In the instant case, the first requirement has clearly been met. Act 233 of 1984, as amended, expressly provides that the purpose for which the Bohemia Spillway was constructed no longer exists and orders a return of all such properties within the spillway to be returned to the previous owners or their successors in title. However, as fully discussed earlier, the properties which had been adjudicated to the state for non-payment of tax and which were not redeemed until after they had been dedicated to public use were not acquired by expropriation nor were they purchased under threat of expropriation. The properties were adjudicated to the state for non-payment of taxes. Thereafter, they were dedicated to public use, thus precluding subsequent redemption by the prior owners of their ancestors in title. As a result, any subsequent acquisition by the Levee Board via act of sales were in the nature of acts of convenience in order to alleviate expensive litigation over the ownership of this property at the time of the *330 construction of the spillway in 1925. Accordingly, these properties were not acquired by the state by expropriation or under threat of expropriation and do not fall within the confines of the exception to the express constitutional prohibition. [Emphasis added.]
The Gomez court went on to explain that Legislative intent to return land is not sufficient to override the constitutional limitations on the state's ability to alienate property found in Article VII, Section 7. We agree.
The acquisition of this disputed land by the State of Louisiana and its agencies and/or political subdivisions was not effected by means traditionally associated with expropriation or eminent domain. The land was not selected by the State pursuant to any finding, resolution or act of the State or any of its agencies of any identified public purpose, and the State did not file suit or perform any act of expropriation which was intended to divest any private owner of his interest in the property. The 1849 act of Congress known as the Swamp Land Act stated that the swamp and overflowed lands were "granted" to the State of Louisiana. Such an acquisition by the State from the government of the United States can in no way be considered an expropriation (at least not by the State) under any definition of the term, even giving the plaintiffs every benefit of the doubt under the most favorable interpretation possible.
The Swamp Land Act of 1849 required the Secretary of the Treasury to direct the surveyor general to make out a list of the swamp and overflowed lands, which list would vest in the State of Louisiana in fee simple upon approval by the Secretary of the Treasury. Thus the State acquired the lands from the federal government through the actions of federal officials pursuant to an act of Congress. In no way could this be described as an acquisition by the State or any of its agencies by means of expropriation or a purchase under threat of expropriation by the State.
To the extent that the plaintiffs' claim may rely on a theory of inverse condemnation, by definition it excludes expropriation. Constance v. State, Though DOTD, 626 So.2d 1151, 1156 (La.1993).
Board of Com'rs of Orleans Levee Dist. v. Dept. of Natural Resources, 496 So.2d 281 (La.1986), cited by the plaintiffs, is inapposite because the land in question (Bohemia Spillway land) was acquired by the State by means of expropriation. It could, therefore, be returned to the successors of the original owners once a determination had been made that the public purpose for which it had been acquired no longer existed. For the same reasons, Vogt v. Board of Levee Com'rs of Orleans Levee District, 95-1187 (La.App. 4 Cir. 1996), 680 So.2d 149, is equally inapplicable.
In a footnote to the Original Brief on Behalf of Appellee, Plaquemines Parish School Board, the School Board states:
This Court of Appeal has already held that the very sixteenth section at issue is subject to the School Trust, and that the School Board has a clear chain of title to that section from 1803. See State ex rel. Plaquemines Parish School Bd. v. Plaquemines Parish Government, 93-2339 (La.App. 4 Cir. 12/15/94); 652 So.2d 1 ("PPSB I"), writ denied, (La.6/23/95); 656 So.2d 1015, and State ex rel. Plaquemines Parish School Bd. v. Plaquemines Parish Government, 96-0936 (La.App. 4 Cir. 2/26/97); 690 So.2d 232 ("PPSB II"). In PPSB I, this court wrote: "On April 30, 1803, France sold the Louisiana territory to the United *331 States upon execution of the Treaty of Cession. The reservation of Sixteenth Section lands attached to the Louisiana territory at this point." 652 So.2d at 2-3. In PPSB II, this Court affirmed the lower court's findings, in accordance with PPSB I, that title to certain Sixteenth Sections of Plaquemines Parish, including the one at issue here, passed to the School Board. 690 So.2d at 233, 235.
Although we agree with this footnote as concerns Sixteenth sections generally, we are unable to determine from reading PPSB I and PPSB II what the exact status is of the Sixteenth section that comprises part of this litigation. While Section 16 of Township 21 South, Range 26, East was set forth in the list of sections included in the PPSB I opinion, on rehearing this Court held that:
Those lands, whether surveyed or unsurveyed, that were subject to the ebb and flow of the tides of the Gulf of Mexico on April 12, 1812, belong to the State by virtue of its sovereignty and are not subject to the school trust. Those lands that form the bottoms of navigable rivers and streams, but are not tidelands, are subject to the school trust.
PPSB I, 652 So.2d at 7.
The real significance of PPSB I is that this Court held that the state may not divert Sixteenth section lands to other public uses (levees), much less private uses, without at least compensating the trust in favor of the schools.
However, our opinion in PPSB I, while it establishes the criteria described immediately above for determining whether land in a Sixteenth section should be considered sovereignty lands or school trust lands, fails to make the actual factual determination as to which lands are sovereignty lands and which lands are school trust lands.
PPSB II also fails to shed any light on the particular sixteenth section involved in the instant case:
The trial court found that eight of the thirteen Sixteenth Sections at issue are not sovereignty lands, and so are subject to the school trust, and that the other five Sixteenth Sections at issue are sovereignty lands and so are not subject to the school trust. Because we find that the legal issue of whether sovereignty lands are subject to the school trust has been decided in favor of the Parish Government in a previous appeal in this same case, and because we find that the trial court was not clearly wrong or manifestly erroneous in its determination of whether each of the Sixteenth Sections at issue was or was not navigable waterbottom or subject to the ebb and flow of the tide in 1812 (i.e., whether each is sovereignty land or not), we affirm the judgment below.
PPSB II, 690 So.2d at 233.
Thus, while our opinion in PPSB II establishes that eight of the disputed Sixteenth Sections are subject to the school trust and that five of them are not, our opinion fails to specify which the trial court designated as which. Therefore, we find that as concerns Section 16 of Township 21 South, Range 26, East only, it is necessary to remand this case to the trial court for a determination of what the judicial determination of the status of that Sixteenth Section was in the trial court that was affirmed by this Court in PPSB II, and a finding on remand by the trial court of how that prior judicial determination impacts the claims of the plaintiffs in this case to that Sixteenth Section.
For the foregoing reasons, the judgment of the trial court is reversed and remanded in part, but only as regards Section 16 of *332 Township 21 South, Range 26, East; in all other respects the judgment of the trail court is affirmed.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
McKAY, J., dissents with reasons.
I agree with the majority that the pivotal issue in this case is whether the State's claim to the disputed lands deriving from the Swamp Land Act of 1849 can be characterized as an expropriation. However, I disagree with the majority's conclusion that the acquisition of the disputed lands by the State from the government of the United States can in no way be considered an expropriation under any definition of the term. The fact that the State acquired the lands from the federal government through the actions of federal officials pursuant to an act of Congress does not change the nature of what happened, i.e. the taking of private property by the government for a public purpose.
Under Louisiana law, "expropriation," which is the civil law equivalent of the common law concept of "eminent domain," is the power of the sovereign to take property for public use without the owner's consent. Mongrue v. Monsanto Co., 249 F.3d 422 (5th Cir.2001). The power of expropriation is inherent in all government, coming into being eo instante with the establishment of government and continuing as long as government endures, and does not require recognition by constitutional provision. Tennessee Gas Transmission Co. v. Violet Trapping Co., 248 La. 49, 176 So.2d 425 (La.1965), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 155 (1965). Accordingly, I believe that the acquisition of the disputed lands by the State from the government of the United States was indeed an expropriation. As such, I would reverse the trial court's granting of the exceptions of no right of action and no cause of action on those grounds. That being said the trial court would have to determine who would be the proper parties to bring this action.
NOTES
[1] Opinion amended on rehearing by Board of Com'rs of Orleans Levee Dist. v. Gomez, 623 So.2d 1282. However, the amended opinion in no changes the rule of law for which the original opinion is cited by this Court.