632 So.2d 408 (1994)
Dian Coleman WININGDER
v.
(Mrs.) Harold BALMER.
No. 93-CA-0874.
Court of Appeal of Louisiana, Fourth Circuit.
February 11, 1994.
Rehearing Denied March 17, 1994.
*409 George V. Baus, Philip A. Franco, Sean D. Moore, Adams and Reese New Orleans, for defendant/appellant.
James J. Coleman, Sr., Peggy Wallace, Coleman, Johnson & Artigues, New Orleans, for plaintiffs/appellees.
Before BYRNES, LOBRANO and WALTZER, JJ.
WALTZER, Judge.
STATEMENT OF THE CASE
Plaintiff/appellee, Dian Coleman Winingder (Winingder), brought suit in September, 1989, for injunctive relief against her neighbor, Sue Ann Frances Balmer (Balmer), to restrain Balmer's proposed construction of a six foot high solid board fence along their common property line. At the time, Balmer was aware that her fence would be located, at various points, within four to six inches of Winingder's residence. The gravamen of Winingder's petition was that the close proximity of the fence to her residence would cause irreparable injury, including health and safety hazards to her family and physical damage to the improvements located on Winingder's property.
The trial court granted a temporary restraining order on September 29, 1989, which was dissolved on October 4, 1989 because of a procedural defect. Following dissolution of the restraining order, Balmer completed construction of the fence. Winingder filed First, Second and Third Amended Petitions, ultimately seeking injunctive and declaratory relief and determination of a servitude under LSA-C.C. Art. 667. Balmer filed an exception of no cause of action, which was granted by the trial court. On appeal, this Court held that the petition stated a cause of action under article 667.[1]
Trial was held on December 14, 1992, and following the close of evidence, the trial judge ruled for the plaintiff. A judgment of January 12, 1993 granted plaintiffs a legal *410 servitude under LSA-C.C. Art. 670 of 2.7 feet along the length of the common property line, awarded Balmer $18,000 as compensation, and ordered Winingder to pay the cost of moving the fence along the length of the servitude, each party to bear her own court cost. From that judgment, Balmer took a suspensive appeal by motion dated January 21, 1993.

FACTUAL BACKGROUND
The essential facts are not in dispute. Winingder, her husband and minor daughters have lived in the house bearing municipal number 1314 Webster Street since 1982. The house, built over eighty years ago, is located within inches of the common property line of the Balmer property, which bears municipal number 1324-26 Webster Street. At the time of Winingder's purchase, there was no fence along the common property line, except the remains of a broken down chain link structure.
Balmer purchased 1324-26 Webster Street in 1988. It adjoined the property on which her own home, bearing municipal number 1328 Webster Street, was located and where she had lived for more than fifteen years prior to her acquisition. Subsequent to her purchase, Balmer demolished the duplex and garage that constituted the improvements at 1324-26 Webster Street. Balmer was aware of the location of Winingder's home, and of the fact that it encroached on the common property line; she could also observe that Winingder's electrical utility box, air conditioning units and hot water heaters were located on the north side of her property adjoining Balmer's new acquisition, and that workmen engaged at the Winingder home had to cross onto the adjacent property in order to work on the north side of the house. Maintenance work was performed at Winingder's home on approximately a monthly basis, using the access through the Balmer property, with Balmer's knowledge and without complaint.
After Balmer's acquisition of the adjoining property, Winingder's husband initiated negotiations with Balmer seeking to achieve a mutually acceptable plan for development of Balmer's newly-acquired property, or in the alternative for purchase of a three foot strip of property along the common boundary line, but the negotiations were unsuccessful, and Balmer began construction of a solid wooden fence, six feet high, running the length of the common property line. This fence blocked off a rear window and a side window of the Winingder home, and blocked access to Winingder's utilities, hot water heaters and air conditioning units.
Plaintiff's witnesses at trial testified concerning certain specific categories of damage and hazard created by the position of the Balmer fence.
RESTRICTION OF DRAINAGE
Ross D. Cashion, Jr., a semi-retired surveyor, testified as a graduate engineer and expert in the field of surveying immovable property. He surveyed the Winingder house and found the following encroachments along the north side of the property:
The rear annex, or "carriage house", encroached on the adjacent lot by about two inches.
The gutter line encroached on the north side.
Additionally, the Balmer lot had been built up above grade along her flower beds, within a space of about four feet north of the north property line of the Winingder property. Cashion offered the opinion that the board fence was so close to the Winingders' property line that the rain water from the side of the house was confined to drain through a very narrow strip of land between the fence and the building line. This confinement was so intense that it caused water to seep into the Winingder house. Prior to construction of the Balmer fence, water was fully free to spread out to the north as well as to the west, allowing for some cross drainage.
Cashion testified without contradiction that while boundary line fences are common in New Orleans, it is unusual to see a fence, particularly a board fence such as that installed by Balmer, constructed where there is a building along the property line.

FIRE HAZARD
Plaintiff qualified James Mazerat as an expert in fire inspections and safety programs. His expertise includes fire investigations, *411 safety inspections and evaluations before and after fires concerning possible life safety or building code violations. He noted the following fire hazards created by the fence:
According to the present floor plan, the Balmer fence denies egress through the rear laundry room window. The Winingder's first floor bath, bedroom and laundry room are located six steps below the main floor level. These rooms have two exits: through the south side of the bedroom and the north side laundry room window. Because the fence is within four inches of this window, a person attempting to flee a fire would be trapped in the laundry room or between the fence and the north wall of the house. Mazerat noted that a fire in any other part of the house would not be apparent to a person in those three lower level rooms until smoke effectively would deny them egress through the front of the house.
The electrical panel is a major source of electrical house fires. The only access to the Winingders' panel is through the living room window. A workman working on the panel would be working in a confined area with energized wiring, and would not be able to avoid serious burns or other electrically-induced injury in the event of an electrical mishap because of the close quarters in which he would be working.
To extinguish a fire on the north side of the house, to get to any small appliance, for example, that caught fire, the fire fighters would have to first tear down the fence.
In case of a fire in the laundry room or lower level bathroom or bedroom, the fence would obscure the single window and the fire fighters would not know where to take down the fence to make entry into the house.
The fire hazard caused by the proximity of the Balmer fence constitutes an immediate danger, and is neither speculative nor remote. Such a condition clearly affects adversely the quality of life not only of Winingder, but also of her family members.
Balmer offered no evidence to contradict this testimony.

STRUCTURAL DAMAGE
Winingder offered the testimony of Edward R. Wedge, Jr., whose career includes experience as a draftsman, project manager, plant manager, and vice president of a large, regional architectural woodwork and building materials company. He has conducted two or three hundred investigations of exterior wood rot, decay, sinking and expansion, and was qualified by the trial court as an expert in the field of architectural woodwork.
Wedge examined the north wall of the Winingder home visually, and with a moisture meter, on a dry day. In order to gain access to the area between the fence and the house where he took his readings, he had to climb up on a counter in the laundry room, open the window and try to squeeze out in the four inches between the window and the fence. When he put his hand outside the window, he felt the exterior wall was wet, and measured the wetness with the moisture meter. To use the meter, he had to use a ladder, and testified that coming out on an angle onto the fence and going down safely was "pretty testing." He said that because of his small frame, he was able to squeeze through by slightly bending the pipe fence post. The meter showed the wood on the north side of the Winingder carriage house below the level of the upper line of the fence to be fully saturated with water (a meter reading of thirty), in contrast to the area above the fence line, which was normal (a reading of between eight and ten). The area below the upper line of the fence was triple the Federal Housing Administration standard for the optimum moisture content for wood in this region. This saturated condition was caused, according to Wedge, by the fence's trapping humidity, leaves and mulch, all of which contribute to the saturation of the wood. He testified that the water was wicked up from the rotting base to the upper portion of the wall, causing deterioration throughout the wall. The wet leaves that blew between the fence and the wall could not be removed from the Winingder property because of the fence's proximity. The lack of sun and air circulation caused by the fence prevents the exterior wood from drying out. Significantly, should the Winingders replace *412 the siding that Wedge testified was rotten, the new wood will rot as well, unless the moisture-entrapping fence is removed.
Balmer offered no testimony to contradict Wedge's opinion.

INSECT DAMAGE
Joseph Azzarealo was called as an expert in structural entomology, specializing in urban pest management. Azzarealo holds a BS degree in entomology as well as a Master's degree and is president of Dial OneFranklynn Pest Control Company. He is a former high school and college teacher of entomology and biology and is board certified in industrial and urban entomology. Azzarealo testified that the Balmer fence, in contact with the ground and only four inches from the north wall of the Winingder residence, creates "an ideal situation for termites to gain entry into a wooden structure."
He testified further that when the fence posts were dug, the chemical termite barrier that the Winingders had installed around their home was physically removed. The chemical barrier was also breached because of the debris that collects between the fence and the house wall, and which cannot be accessed for removal without taking down Balmer's fence. Azzarealo also pointed out that the chemical originally used to protect the Winingder house is more potent and more effective than anything that can be used currently to replace the chemical barrier. The close proximity of the fence also encourages undetectable rodent burrows which further damage both the house and the chemical barrier surrounding it. In addition, the house cannot be inspected fully for termites annually as required for continuation of the standard termite control warranty contract. Because of the high moisture content in the wooden house wall, normally subterranean termites can form colonies in the wall itself without any contact below the ground surface. The moisture trapped in the wall is sufficient to provide a habitable environment for the termites within the wall itself, regardless of the re-installation of a chemical barrier around the perimeter of the house. The proximity of the fence is also a violation of the standard contract for termite control used by the Structural Pest Control Commission. Thus, if the Winingders were to go to the expense of removing the fence, retreating their home, and replacing the fence as Balmer insists along the property line, the contractual warranty for the termite service would be null and void.
Balmer introduced no evidence to contradict this testimony.

APPLICABLE LEGAL PRINCIPLES
SERVITUDE UNDER LSA-C.C. 670
The judgment of the trial court, granting a legal servitude in favor of the Winingder estate, and requiring payment by Winingder to Balmer of the value of the servitude and the cost of moving the Balmer fence and gate is authorized by article 670 of the Louisiana Civil Code, which provides in pertinent part:
"When a landowner constructs in good faith a building that encroaches on an adjacent estate and the owner of that estate does not complain within a reasonable time after he knew or should have known of the encroachment, ... the court may allow the building to remain. The owner of the building acquires a predial servitude on the land occupied by the building upon payment of compensation for the value of the servitude taken and for any other damage that the neighbor has suffered." LSA-C.C. 670.
"A landowner may in good or in bad faith rest a part of his building on the land of a neighbor. If the encroachment is made in bad faith, the neighbor has a right to demand removal of the building from his property and damages. If the encroachment is made in good faith, a legal servitude may be established under the terms of Article 670 of the Louisiana Civil Code. This article provides that when a landowner constructs in good faith a building that encroaches on an adjacent estate and the owner of that estate does not complain within a reasonable time after he knew or should have known of the encroachment, or in any event complains after the construction is substantially completed, the court may allow the building to remain. The owner of the building then acquires a predial servitude on the land occupied by *413 the building upon payment of compensation for the value of the servitude taken and for any other damage that the neighbor has sustained." A.N. Yiannopoulos, Predial Servitudes, 4 La.Civil Law Treatise § 24 (1983) at p. 83.
Professor Yiannopoulos notes that prior to enactment of article 670, a similar result was fashioned judicially by application of the equity provision of Article 21 of the Civil Code. See, A.N. Yiannopoulos, supra § 24, footnote 24. The trial judge fashioned a remedy consistent with the equitable background of article 670, to address the unusual situation created by the particular facts of this case, and the effect of such a remedy is strictly limited to those facts. These neighbors have substantial investments of money and of emotional energy in their respective homes; they share a common border, the bounds of which are undisputed, but which because of the position and encroachment of improvements, is and will continue, if unaffected, to remain a source of friction throughout the future. The trial judge, using the legal basis of the article 670 servitude, and equitable principles of article 21, recognized the equities favoring Mrs. Balmer by ordering compensation of approximately triple the value she paid for full ownership of the property on which the servitude was imposed. Mrs. Balmer remains in possession of this strip of property, and remains its owner, subject only to the servitude for which the Winingders are obliged to pay handsomely.
The encroachment by the Winingder house predates Balmer's acquisition of 1324-26 Webster Street. The encroachment appears on the survey of the property and the Winingders' windows and utilities were obvious to any interested observer. Balmer purchased her property with full knowledge of the nature and extent of these encroachments. Uncontroverted evidence was produced at trial that workmen at the Winingder home routinely gained access to the north side of the house by walking through the adjacent property, and neither Balmer nor her ancestor in title complained of this procedure. The record fully supports the trial court's implicit finding of Winingder's good faith and the need to establish a servitude. In Bushnell v. Artis, 445 So.2d 152 (La.App. 3d Cir.1984), the court of appeal affirmed a trial court's finding that:
"[D]efendant must be allowed enough room to maintain and repair her building and keep noxious weeds from that part of her house. In addition, it should be self-evident that plaintiff and defendant have very poor relations with each other but seem destined to be neighbors. A straight boundary dividing their respective territory would seem more likely to eventually lessen their differences, rather than the possibility of a fence with right angle turns encompassing the immediate perimeter of defendant's house as a constant reminder to the parties and their successors of the problem which now is of such vital interest to them and which needs very badly to be put to rest." Bushnell, supra at p. 155.
Like the litigants in Bushnell, the Balmers and the Winingders are destined to remain neighbors. The trial court recognized the wisdom of providing a framework for that destiny that will require the least possible likelihood of necessitating further resort to the Courts. Merely to order removal of the offending fence pursuant to article 667 will not calm these turbulent waters. It is not difficult to imagine further difficulties should Mrs. Balmer reconstruct the fence at a distance of one or two inches to the north of the present fence. The trial judge chose a reasonable width for the article 670 servitude, which would allow access to the Winingders and to those having need to service the Winingder premises, while alleviating the fire hazard and moisture damage. The trial judge separated the "contending waters" of the Winingder and Balmer "oceans" with a device (the servitude) that operates not unlike the locks in a canal, to prevent the discord and disharmony attendant on the meeting of the oceans.
While the trial court's remedy under article 670 proceeds from an equitable background, plaintiff is not required to prove that she is a possessor in good faith as defined in Louisiana Civil Code article 487.[2] Plaintiffs *414 in Bushnell sought to defeat a similar article 670 servitude based on the defendant's lack of article 487 good faith, and relied on the defendant's lack of an act stating title to the portion of land representing the encroachment. The court held:
"Plaintiffs base their argument on the definition of `possessor in good faith' found in LSA-C.C. 487. We disagree. That article requires the good faith possessor to possess by virtue of an act translative of title. The opening language of Art. 487 restricts that definition of good faith solely `for the purposes of accession....' Art. 670 does not appear in the same title of the Civil Code as Art. 487. Accordingly, the definition of good faith found in Art. 487 is not applicable to the provisions of Art. 670." Bushnell v. Artis, supra at p. 154.
The judgment granting Winingder's servitude implicitly finds plaintiff to have been in good faith. In the absence of manifest error, we will not disturb the trial court's factual determination of good faith within the context of LSA-C.C. 670 implicit in its rendition of judgment in Winingder's favor. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Rosell v. ESCO, 549 So.2d 840 (La.1989).

LIABILITY UNDER LSA-C.C. 667
The trial court's finding that Balmer's fence constituted a violation of article 667 of the Civil Code is supported by the evidence. LSA-C.C. article 667 provides:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
Article 668 of the Civil Code modifies the neighbor's actionable right of enjoyment:
"Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor...."
Our analysis of the legal consequences of Balmer's action in locating her fence on the property line, given the factual conclusions of the trial court, is guided by Justice Dennis' excellent summary of the relationship between articles 667 and 668 of the Louisiana Civil Code, and the distinction between "damage" and "inconvenience." State through Dept. of Transp. and Development v. Chambers Inv. Co., 595 So.2d 598 (La.1992). It is this distinction that controls the outcome of the case at bar.
"First, although, in principle, a landowner may use and enjoy his property as he sees fit, Article 667 provides that he may not exercise his right in such a way as to cause damage to his neighbors. Second, although, in principle, the landowner may exclude any interference with his property, he is bound by Article 668 to tolerate certain inconveniences resulting from the lawful use of another neighbor's property. A. Yiannopoulos, Predial Servitudes, 4 La.Civil Law Treatise Sec. 34 (1983) [hereinafter "Yiannopoulos on Servitudes"], citing La.C.C. art. 477 (1979 and Supp.1991); Critney v. Goodyear Tire & Rubber Co., 353 So.2d 341. (La.App. 1st Cir.1977); Balis, Civil Law Property 87 (3d ed. 1955) (in Greek), and other authorities.
"Accordingly, in order to decide whether the State caused any damage to the claimant's right of ownership, we must determine whether the State's construction activities resulted in inconveniences that must be tolerated by the claimant under Article 668 or, rather, resulted in more serious inconveniences or interference that may be suppressed under Article 667. This is not always easy to determine. Broad language in certain court decisions might be taken to mean that there is no distinction between compensable and noncompensable damage, but the jurisprudence as a whole indicates that not all damage is recoverable under Article 667.

*415 In fact, as Professor Yiannopoulos has observed, "cases properly anchoring responsibility on this article either involve damage caused through fault or damage caused by constructions, by escaping dangerous substances, such as dammed water or sewage, and by ultrahazardous activities, such as dynamite blasting, spraying noxious chemicals, and pile driving operations by heavy equipment. No case has been found in which a landowner or other person was held liable under Article 667 for non-negligent acts and activities that were not ultrahazardous." Yiannopoulos on Servitudes, supra, Sec. 50, at 139-40, citing extensive authorities. For all other non-negligent acts, works, and activities that cause damage or inconvenience to neighbors, Professor Yiannopoulos recommends that the concept of abuse of right of ownership should be used to establish the line of demarcation between acts that constitute a lawful exercise of ownership and those that are forbidden by Article 667. Id., citing D'Albora v. Tulane University, 274 So.2d 825, 832 (La.App. 4th Cir.1973); J. Cueto-Rua, Abuse of Rights, 35 La. L.Rev. 975 (1975), and other authorities. We are not prepared to say that, in all cases, a landowner must prove an abuse of right of ownership before he may suppress or recover for a violation of Article 667 by a neighbor. But we think that in a case, such as the present one, in which there is no allegation or evidence of personal injury or physical damage to property, it is consistent with the principles of the Civil Code and our jurisprudence to require proof of the presence of some type of excessive or abusive conduct to hold a landowner responsible under Article 667.
"Thus, the limitations established by Article 667 upon the State's use and enjoyment of its land, and the requirements imposed by Article 668 on the claimant to tolerate some inconvenience, also serve to mark the boundaries of each party's respective right to develop its land. Because the claimant's right to enjoy its property is not absolute but extends only as far as the law allows it, La.C.C. art. 667-669, unless the obligations and limitations of neighborhood are violated, the property rights of the claimant have not been violated. In other words, as long as the activities on the State's land do not exceed the level of causing the claimant "some inconvenience," there can be no taking or damaging of the claimant's property right." State, through Dept. of Transp. and Development, supra at pp. 604-605.
In Constance v. State, through Dept. of Transp. and Development, 626 So.2d 1151, 1157 (La.1993), the Louisiana Supreme Court restated the Chambers conclusion:
"[W]here there is no allegation or evidence of personal injury or physical damage to property, a finding of liability under Article 667 `require[s] proof of the presence of some type of excessive or abusive conduct.' " (citing Chambers.)

Thus, it is not necessary always that plaintiff prove defendant's abuse of right. While the record reflects Balmer's total disdain for the difficulties and dangers caused by the placement of her fence on the property line, we need not reach the issue of abuse of right.[3]
Under the standard set forth in Chambers Development Company, in order to state a claim under the pertinent code articles, there must be a showing of personal injury or physical damage to property.
The evidence submitted by Winingder at trial supports both her deprivation of enjoyment and actual and likely future damages arising out of the location of Balmer's fence. The evidence adduced at trial shows that the Balmer fence presented a safety hazard, caused moisture damage to the house's structure, increased the likelihood of damage caused by termites and diminished the Winingder *416 family's enjoyment of their home. These violations of the laws of vicinage give Winingder the right to amelioration of the damage and injunctive relief to forestall future damage not only to her property, but also to the lives and personal safety of her family members.
The record below amply demonstrates the unlikelihood of an amicable resolution of this conflict between neighbors. Balmer's total intransigence and unwillingness to modify the plans for her garden and garage indicate the necessity for a legal determination of Winingder's right to access to her utilities, and to removal of the fire hazard and cause of the deterioration of her home's north wall. The trial court fashioned a remedy consistent with the civilian law of servitudes and particularly designed to eliminate, to the greatest extent possible, the likelihood of future conflict. Under the specific facts of this case, we find that the court was not manifestly erroneous or clearly wrong in granting a servitude herein, and affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] "Plaintiff's petition states that the defendant built the fence four to six inches from her home and that this fence has deprived her of the liberty of enjoying her property by the denial of access. We find that the plaintiff has stated a cause of action under La.Civil Code art. 667. This case is remanded to the trial court for a full hearing on this matter consistent with this judgment." Winingder v. Balmer, 577 So.2d 1233 (La.App. 4th Cir.), writ denied, 586 So.2d 565 (1991).
[2] In the Chapter entitled "Right of Accession," the possessor in good faith is defined:

"For purposes of accession, a possessor is in good faith when he possesses by virtue of an act translative of ownership and does not know of any defects in his ownership. He ceases to be in good faith when these defects are made known to him or an action is instituted against him by the owner for the recovery of the thing."
[3] Balmer's attitude is reflected in her suggestion in the reply brief, that the appropriate resolution of this matter would require Winingder's family home to be demolished and Mrs. Balmer to be awarded unalleged, unquantified and unproved damages. This suggestion is unsupported by the evidence or by the applicable law. Balmer has offered no proof of Winingder's bad faith in purchasing a property whose improvements encroach upon the adjacent property. Neither Balmer nor her ancestor in title complained of the position of Winingder's home or the passage of her workmen onto the adjacent property at anytime prior to this litigation.